922 N.E.2d 740 (2010)
In Matter of Termination of the Parent-Child Relationship of A.B., J.B., and M.M., Minors,
A.M.B., Mother, Appellant,
v.
Indiana Department of Child Services, and Lake County Court Appointed Special Advocate, Appellees.
No. 45A03-0910-JV-476.
Court of Appeals of Indiana.
March 12, 2010.
*741 Deirdre L. Monroe, Gary, IN, Attorney for Appellant.
Eugene Velazco, Jr., Gary, IN, Attorney for Appellee Lake Co. Dept of Child Services.
*742 Donald W. Wruck, Dyer, IN, Attorney for Court Appointed Special Advocate.

OPINION
MATHIAS, Judge.
A.M.B. ("Mother") appeals the involuntary termination of her parental rights to her three children, A.B., J.B., and M.M. Mother raises several allegations of error, including an assertion that she was denied due process of law when she was not permitted to testify during the termination hearing. Although Mother was twenty minutes late to the termination hearing, which itself commenced more than an hour behind schedule, we believe that under the unique facts and circumstances before us, she should have been afforded the opportunity to testify. In light of the constitutional dimensions of the right to parent one's child, we reverse and remand for at least the opportunity for Mother to be heard.

Facts and Procedural History
Mother is the biological mother of A.B., born on March 30, 2004, J.B., born on April 2, 2005, and M.M., born on June 12, 2006 (collectively, "the children").[1] In April 2007, Mother contacted the Lake County Office of the Indiana Department of Child Services ("LCDCS") to request LCDCS take custody of the children. In so doing, Mother informed LCDCS that she was unable to care for the children and had no place to live.
LCDCS took the children into custody and a detention hearing was held the same day. At the conclusion of the detention hearing, the juvenile court issued an order authorizing the children's removal, finding probable cause to believe A.B., J.B., and M.M. were children in need of services ("CHINS"), and adjudicating the children temporary wards of the State. The court's detention order also directed LCDCS to provide various services for Mother including a substance abuse evaluation, parenting classes, individual counseling, home-based services, and supervised visitation privileges. LCDCS later filed separate petitions under three different cause numbers alleging A.B., J.B., and M.M. were each CHINS.
In June 2007, Mother admitted to several of the allegations contained in the CHINS petitions during a hearing on the matter. The juvenile court adjudicated all three children CHINS and proceeded to disposition. Following the dispositional hearing, the juvenile court ordered A.B., J.B., and M.M. formally removed from Mother's care, retroactive to the date of their initial removal from Mother in April 2007. The court's dispositional order also incorporated LCDCS's Parental Participation Plan, which directed Mother to participate in and successfully complete the juvenile court's previously ordered services, as well as to obtain and maintain stable housing and employment, in order to achieve reunification with the children.
Mother initially complied with the juvenile court's orders by completing parenting classes provided by Metropolitan Oasis in Gary and participating in individual and family counseling with Southlake Center for Mental Health in Merrillville. Notwithstanding Mother's initial compliance with these court-ordered services, Mother failed to consistently visit the children. Mother was also unable to maintain stable housing and employment.
*743 During the CHINS case, Mother eventually secured employment at McDonald's. Mother also leased a home in Lake County, and LCDCS paid Mother's security deposit and first month's rent. Mother refused, however, to comply with LCDCS family case manager Shavon King's referral to the local Township Trustee's office and to apply for future financial assistance. Mother also refused to participate in King's referral for home-based counseling services. Soon thereafter, Mother was evicted from her home for failure to pay her rent. Mother also lost her job at McDonald's.
After being evicted, Mother continued to refuse to accept home-based services, including help with obtaining subsidized housing in Lake County. Instead, Mother informed King that she intended to move to Indianapolis to be with her boyfriend, Father. During her first six months in Indianapolis, Mother lived with Father at a mutual friend's house and failed to participate in any court-ordered services, including visitation with the children.
Mother eventually rented a townhouse in Indianapolis and contacted King regarding visitation with the children. King traveled to Indianapolis to inspect the home and found it to be clean and suitable for the children. King informed Mother that she would consider changing her permanency recommendation from termination to reunification if Mother provided her with a signed copy of the lease and proof of employment. Mother failed to provide King with the requested information.
In February 2009, LCDCS filed petitions seeking the involuntary termination of Mother's parental rights to the children. Mother attended an initial hearing on the termination petitions and was assigned counsel. At the conclusion of this hearing, Mother was ordered by the court to appear on July 7, 2009, at 8:30 a.m. for a consolidated evidentiary hearing on the termination petitions. Mother was also ordered to attend a meeting with her attorney to discuss her case prior to trial. The meeting was scheduled to take place during the week immediately preceding the termination hearing.
Mother initially failed to appear for the termination hearing on July 7, 2009. Although originally set to begin at 8:30 a.m., the termination hearing did not actually get underway until 9:44 a.m. At the commencement of the hearing, the juvenile court was informed that Mother was not present, that she had failed to show for her attorney-client meeting the previous week, and that she had never contacted her attorney. An oral motion to continue the evidentiary hearing was then made.
The juvenile court denied the motion to continue. Mother's attorney, Joann Price, thereafter asked for leave to withdraw her appearance as counsel for Mother, stating she had never spoken with or met Mother. The juvenile court granted attorney Price's motion for leave to withdraw, informed Price she was "free to go," and proceeded with the evidentiary hearing. Tr. p. 23.
The State called King as its first and only witness. At the conclusion of King's testimony, counsel stated, "That's all I have." Id. at 39. The juvenile court then asked King a few additional questions before dismissing the witness.
Immediately after dismissing King from the witness stand, the bailiff informed the juvenile court judge that Mother had arrived at the courthouse. The time noted for the record was 10:05 a.m. The judge commented that Mother "could see [Price]" but further stated, "I'm going to go forward[.] We're almost done here." Id. at 41. Mother was never permitted to enter the courtroom.
*744 After asking the remaining attorneys if there was "anything else," to which the attorneys answered in the negative, the juvenile court granted LCDCS's petition to involuntarily terminate Mother's parental rights to A.B., J.B., and M.M., and the hearing was adjourned. Id. at 41. Later the same day, the juvenile court entered a written judgment, containing findings of fact and conclusions thereon, terminating Mother's parental rights to all three children. This appeal ensued.

Discussion and Decision
Mother asserts on appeal that her constitutional right to due process was violated "because she was not afforded the opportunity to be present in the courtroom, enter evidence[,]or cross-examine witnesses during the termination hearing." Appellant's Br. at 1. Initially, we acknowledge that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re A.I., 825 N.E.2d 798, 804 (Ind.Ct.App.2005), trans. denied. However, these parental interests are not absolute, and parental interests may be terminated when a parent is unwilling or unable to meet his or her parental responsibilities. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct. App.1999), trans. denied.
Regarding the process due parents in termination proceedings, we have previously recognized that in addition to various statutory protections afforded parents, see, e.g., Ind.Code §§ 31-35-2-6.5 (court shall provide parent opportunity to be heard and make recommendations) and 31-32-2-3 (parent entitled to cross-examine witnesses and introduce evidence), the Due Process Clause of the United States Constitution "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." In re B.J., 879 N.E.2d 7, 16 (Ind.Ct.App.2008), trans. denied. It is also well settled that the right to raise one's child is an "essential, basic right that is more precious than property rights." In re C.C., 788 N.E.2d 847, 852 (Ind.Ct.App.2003), trans. denied. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the due process clause. Hite v. Vanderburgh County Office of Family & Children, 845 N.E.2d 175, 181 (Ind.Ct. App.2006).
Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." Id. Assessing whether a parent's due process rights have been violated in a termination proceeding "turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure." C.C., 788 N.E.2d at 852. The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quotation omitted).
In termination cases, both the private interests of the parent and the countervailing governmental interests that are affected by the proceeding are substantial. In particular, this termination action concerns Mother's interest in the care, custody, and control of her children, which has been repeatedly recognized as one of the most valued relationships in our society. In re E.D., 902 N.E.2d 316, 321 (Ind.Ct.App. 2009), trans. denied. As such, Mother's interest in the accuracy and fairness of the *745 termination hearing is "a commanding one." Id.
The State's parens patriae interest in protecting the welfare of the children, on the other hand, is also significant. "Although the State does not gain when it separates children from the custody of fit parents, the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." Tillotson v. Clay County Dep't of Family & Children, 777 N.E.2d 741, 745 (Ind.Ct.App.2002) (citation and quotation marks omitted), trans. denied. Furthermore, delays in the adjudication of a termination case impose significant costs upon the functions of government as well as an intangible cost to the lives of the children involved. E.D., 902 N.E.2d at 322.
When balancing these competing interests between a parent and the State, we must also consider the risk of error created by the challenged procedure. Mother contends the risk of error is great because by granting her attorney's request to withdraw from the case and then later refusing to allow Mother to participate in the termination hearing, Mother was prohibited from cross-examining the State's witness, presenting a defense, and introducing evidence on her own behalf.
The record reveals that Mother failed to appear for the termination hearing at 8:30 a.m. as scheduled, without explanation, and continued to be absent when the hearing ultimately commenced at 9:44 a.m. A juvenile court may presume a parent knowingly and voluntarily has waived his or her right to be present during the termination hearing upon a showing that the parent was properly notified of the scheduled trial date but failed to appear. See, e.g., In re C.B., 616 N.E.2d 763, 770 n. 4 (Ind.Ct.App.1993) (stating that right to be present at a CHINS hearing is waived by party's failure to appear after lawful notice). The juvenile court therefore acted within its discretion when it initially proceeded with the termination hearing in Mother's absence, having first verified that Mother had received proper notification of the date, time, and location of the hearing.
Mother eventually appeared at the courthouse, however, and her presence was made known to the judge at 10:05 a.m., before the conclusion of the termination hearing. Despite notice to the court that she was present, Mother was prohibited from entering the courtroom and participating in the remainder of the termination hearing.
We acknowledge that a parent does not have a constitutionally guaranteed right to be physically present during a termination hearing. See C.C., 788 N.E.2d at 853. Nevertheless, we conclude that the risk of error is substantial where, as here, the juvenile court terminates Mother's parental rights after conducting a short hearing during which only one witness for the State testifies, no cross-examination is conducted, Mother is not represented by counsel, and Mother is prohibited from attending the hearing and/or presenting evidence in her favor although present in the courthouse before the end of the hearing, albeit late. Under such circumstances, the juvenile court may not have had an accurate picture of the evidence before making its termination decision. See Thompson v. Clark County Div. of Family & Children, 791 N.E.2d 792, 795 (Ind.Ct.App.2003), trans. denied (stating risk of error created by entering termination judgment after conducting hearing as a summary proceeding is substantial where parent does not have opportunity to present witnesses in his or her favor or cross-examine opposing witnesses and thus juvenile court may not *746 have accurate picture of evidence before making its decision).
These are very hard and unusual facts, and our opinion should not be broadly extended to other cases and circumstances. This court does not condone Mother's failure to appear for the termination hearing in a timely manner. As a panel, we are acutely aware of the fact that Mother's tardy appearance was undoubtedly inconvenient and frustrating for all of the other parties involved, especially after her general lack of concern and cooperation with authorities regarding her children. Nevertheless, the slight delay, the small, additional cost and even any incremental emotional strain upon the children that may have resulted from permitting Mother to participate in the remainder of the evidentiary hearing are far outweighed by the fairness that Mother's participation would have ensured. After balancing Mother's substantial interest with that of the State, and in light of the heightened risk of error created by the challenged procedure, we conclude that the juvenile court violated Mother's constitutional right to due process of law when it prohibited Mother from participating in the termination hearing. We therefore remand this case to the juvenile court with instructions to give Mother a new opportunity to testify on her own behalf. Should Mother avail herself of this opportunity, we are confident the juvenile court will reconsider its judgment in light of any new evidence and render a new judgment if necessary.
Remanded for proceedings consistent with this opinion.
BARNES, J., and BROWN, J., concur.
NOTES
[1] The parental rights of the children's alleged biological father, M.M. ("Father"), were involuntarily terminated by the juvenile court in its July 2009 termination order. Father does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinently solely to Mother's appeal.