**In re the Matter of the PATERNITY OF L.J.S.,**

**M.W.S., Father, Appellant–Respondent,**

v.

**M.S.S., Mother, Petitioner,**

**L.S. and B.S., Maternal Grandparents, Appellees–Intervenors.**

No. 69A01–0904–JV–181.

Court of Appeals of Indiana.

March 16, 2010.

Transfer Denied June 17, 2010.

Karl L. Mulvaney, Nana Quay–Smith, Natalie M. Snyder, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

R. Patrick Macgrath, Merritt K. Alcorn, Alcorn Goering & Sage, Madison, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

L.J.S. was born out of wedlock. In a custody dispute between L.J.S.'s maternal grandparents, L.S. and B.S. ("Grandparents"), and his natural father, M.W.S. ("Father"), the trial court granted Grandparents' request for custody. Father appeals, raising the following restated issue: whether the important and strong presumption that L.J.S.'s interests are best served by placement with Father has been clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with Grandparents.

We hold that it has not. Accordingly, we reverse and remand.

### FACTS AND PROCEDURAL HISTORY

On January 3, 2006, M.S.S. ("Mother") gave birth to L.J.S. At the time, Mother lived with Grandparents in their Holton, Indiana home and returned there with L.J.S. upon their release from the hospital. On September 8, 2006, Mother filed a petition to establish paternity and child support. That same day, Mother and Father (together, "Parents") entered into an Agreed Judgment of Paternity ("Agreed Order").

The Agreed Order granted custody of L.J.S. to Mother and granted Father visitation "as agreed by the parties but no less than the Indiana Shared Parenting Time Guidelines." *Appellant's App.* at 23. As part of the Agreed Order, the trial court established a $192.00 weekly child support obligation and directed Father to reimburse Medicaid and Mother for the expenses associated with L.J.S.'s birth.

Mother and L.J.S. continued to live with Grandparents for the first fifteen months of L.J.S.'s life. In April 2007, Mother and L.J.S. moved out of Grandparents' home to live in Madison, Indiana, with Mother's new boyfriend. Grandparents and Mother mutually agreed that L.J.S. would continue to stay at Grandparents' home three nights a week, both because L.J.S. was "imbedded" in Grandparents' home and because it was convenient in light of Mother's work schedule and L.J.S.'s daycare schedule. *Tr.* at 29. This arrangement continued for the eight-month period that Mother and L.J.S. lived in Madison. On January 1, 2008, L.J.S. and Mother moved

back to Grandparents' house, where they lived for the next six months. In June 2008, Mother moved to Kentucky but, by mutual agreement of Mother and Grandparents, L.J.S. remained with Grandparents.

Meanwhile, in September 2006, following the entry of the Agreed Order, Father began regular visitation with L.J.S. Initially, Father would pick L.J.S. up every other weekend and would take the child to Father's home for a day and would bring him back. During the first six months of 2007, Father continued to live and work in New Albany, Indiana. To make more money, Father moved to Carrollton, Kentucky in June 2007 to work for a power plant, but was laid off three months later. Occasionally, work commitments required Father to call Mother and reschedule his weekend visits. Father testified that he and Mother "worked very well together on this ... and there [were] some weekends [he] would go two (2) weekends in a row at that time." *Tr.* at 161.

Father then moved to Winchester, Indiana, where he worked construction from September 2007 until June 2008 and earned $21.00 per hour. Father moved to Winchester to be closer to home. While in Winchester, Mother and Father arranged Father's visitation, and L.J.S. had overnight visits with Father every other weekend.

Father's child support payments were made through employer withholdings. On August 29, 2007, the State filed a petition for contempt against Father, alleging he was $1,398.05 in arrears on his child support payments.

On June 2, 2008, Father went to Oklahoma for job training. While away, maternal grandfather, L.S. ("Grandfather"), called Father to inform him that Mother had moved to Kentucky and had left L.J.S. in Grandparents' care. Grandfather stated that, in order to have some type of legal recourse in case something would happen to L.J.S., Grandparents' attorney had prepared guardianship papers, which Mother had signed. Initially, Father also seemed agreeable to sign. About a week later, Father changed his mind and told Grandfather that he "[did not] want to sign those papers." *Tr.* at 44.

During Father's time in Oklahoma, Father was unable to visit with L.J.S., but was in constant contact with Grandfather. Father completed his training and returned from Oklahoma on July 11, 2008. Before his return, Father and maternal grandmother, B.S., agreed that Father's every-other weekend visitation would again commence. Father had a three-day visitation with L.J.S. on July 19, 2008, and planned to have visitation two weeks later.

After Father returned from Oklahoma, he contacted his attorney, who prepared a stipulation to: (1) grant Father sole legal and physical custody of L.J.S.; (2) preclude Mother from having any parenting time with L.J.S.; (3) forgive Father's arrearage; and (4) remove Mother's future obligation to pay child support. During the first week of August 2008, Father traveled to Kentucky and obtained Mother's signature on the stipulation. Believing that he had the right to have L.J.S. in his care, Father picked L.J.S. up from Grandparents' home on August 3, 2008, and took L.J.S. to visit Father's family in Tennessee.

On August 7, 2008, Father filed the signed stipulation with the trial court. The following day, the trial court "decline[d] to approve [the] stipulation," for the reason that it "provide[d] for no visitation and no child support without evidence to substantiate a deviation from the child support and parenting time guidelines." *Appellant's App.* at 53. After learning

that, without the stipulation, he had no right to keep L.J.S. in his care, Father returned L.J.S. to Grandparents. Thereafter, Father paid the $1,635.00 in delinquent child support.

Grandparents filed petitions on August 13, 2008 requesting that they be named L.J.S.'s de facto custodians and granted legal custody of L.J.S. A few days later, Father filed his own petition for custody of L.J.S. Mother did not object to her custody being modified.

From August 18, 2008 through the January 15, 2009 custody modification hearing, Father worked in Kentucky, and earned "approximately $26.40 per hour for 40 hours [plus] . . . some overtime every other weekend." *Appellant's App.* at 14. Father continued visitation with L.J.S. during this time.

On January 15, 2009, the trial court conducted a hearing on all pending motions and issued its findings of fact, conclusions thereon, and order on February 27, 2009 (the "Order"). The Order modified the custody of L.J.S. from Mother to Grandparents, and Parents were granted reasonable visitation pursuant to the Indiana Parenting Time Guidelines. Father filed his notice of appeal on March 16, 2009. On March 19, 2009, the trial court granted the Grandparents' petition that the findings be amended *nunc pro tunc* to reflect that Grandparents' petitions for recognition as de facto custodians and for change of custody had been granted.

Although a notice of appeal was filed, Father's prior counsel failed to timely file an appellant's brief, and the appeal was dismissed. Our court granted Father's petition for rehearing and allowed the appeal to be reinstated on September 24, 2009. Additional facts will be added as needed.

## DISCUSSION AND DECISION

■ Father argues that the trial court erred in granting custody of L.J.S. to Grandparents rather than Father when Father did not abandon L.J.S., acquiesce to Grandparents' custody, or act as an unfit parent.[1]

■ Pursuant to the Agreed Order, Mother was granted custody of L.J.S., and Father was granted visitation rights. A petitioner seeking a subsequent modification bears the burden of demonstrating that the existing custody order should be altered. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945 (Ind.Ct.App.2006). All parties agree that, under the circumstances, modification of L.J.S.'s custody from Mother was required. The only question presented is whether the trial court erred in granting custody to Grandparents.

Here, we are not confronted with a custody dispute between two parents. Mother's abandonment of custody of L.J.S. changes the custody analysis from one between parents to one between a natural parent and a third party. As a result, "the focus is significantly different because the parties are not on par." *In re Custody of McGuire*, 487 N.E.2d 457, 460 (Ind.Ct. App.1985); *see In re Paternity of K.I.*, 903 N.E.2d 453, 460 (Ind.2009) (in custody dispute between parent and third party, burden is always on third party).

---

1. Father also contends that the trial court erred in finding Grandparents were L.J.S.'s de facto custodians. Our disposition of this case, however, does not require that we address this issue. Assuming without deciding that Grandparents qualify as de facto custodians, they must still overcome the strong pre-

sumption in favor of Father, the natural parent, in order to gain custody of L.J.S. *See In re Paternity of T.P.*, 920 N.E.2d 726, 731 (Ind. Ct.App.2010), *trans. pending.* Accordingly, we consider whether the trial court committed clear error in concluding that Grandparents overcame this presumption.

Where the dispute involves a parent and a third party, we cannot ignore the constitutional implications; the relationship of a parent and a child is of a constitutional dimension. *In re K.S.,* 750 N.E.2d 832, 836 (Ind.Ct.App.2001); *In re Guardianship of L.L.,* 745 N.E.2d 222, 228 (Ind.Ct.App.2001), *trans. denied.* "As the United States Supreme Court has recently reiterated, the Fourteenth Amendment's Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *In re L.L.,* 745 N.E.2d at 228–29 (citing *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)).[2] Moreover,

> "[T]here is a presumption that fit parents act in the best interests of their children.... [S]o long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."

*Id.* at 229 (quoting *Troxel,* 530 U.S. at 68, 120 S.Ct. 2054). "Thus, the preference in favor of a parent having custody of his or her children, where the parent has not been shown to be unfit, is rooted in the United States Constitution." *Id.*

Although the child's best interest is still of great importance, it is presumed that it is in the best interest of the child to be placed in the custody of the parent. *Allen v. Proksch,* 832 N.E.2d 1080, 1098, (Ind.Ct.App.2005); *In re McGuire,* 487 N.E.2d at 460 (citing *Hendrickson v. Binkley,* 161 Ind.App. 388, 393, 316 N.E.2d 376,

380 (1974), *cert. denied* (1975)). Consequently, a nonparent who seeks to displace the parent as custodian bears the burden of overcoming the parent's presumptively superior right to custody. *In re McGuire,* 487 N.E.2d at 460 (citing *Hendrickson,* 161 Ind.App. at 393, 316 N.E.2d at 380).

For more than a century, our courts have relied on our Supreme Court's reasoning in *Gilmore v. Kitson,* 165 Ind. 402, 406, 74 N.E. 1083, 1084 (1905) when deciding a custody dispute between a natural parent and a third party. In *Gilmore,* the mother's will expressed the desire that her sister, and not the child's father, have custody. Following the mother's death, the trial court granted custody of the child to the mother's sister. Reversing, our Supreme Court noted that while "the interest of the child is the paramount consideration ... we cannot conceive that it should be invoked or enforced against a parent under no disabilities, unless he has forfeited his right by misconduct, or lost it by voluntary relinquishment or by long acquiescence in the care and custody of his child by another." *Gilmore,* 165 Ind. at 407, 74 N.E. at 1084.

Almost one hundred years later, in *In re Guardianship of B.H.,* 770 N.E.2d 283 (Ind.2002), our Supreme Court addressed the case law that has evolved from *Gilmore* and concluded:

> Despite the differences among Indiana's appellate court decisions confronting child placement disputes between natural parents and other persons, most of the cases generally recognize the important and strong presumption that the child's best interests are ordinarily served by placement in the custody of

---

**2.** While *Troxel* specifically addressed the constitutionality of a Washington statute governing third party visitation, our court has cited to *Troxel* in a custody case as support for the general statements indicating the favor that natural parents enjoy under the United States Constitution. *In re Guardianship of L.L.,* 745 N.E.2d 222, 229 n. 1 (Ind.Ct.App.2001), *trans. denied.*

the natural parent. This presumption does provide a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests. To resolve the dispute in the caselaw regarding the nature and quantum of evidence required to overcome this presumption, we hold that, before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because "a third party could provide the better things in life for the child." In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important but the trial court is not limited to these criteria. The issue is . . . whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required.

*In re B.H.*, 770 N.E.2d at 287 (citations omitted). Our Supreme Court restated this reasoning in *In re K.I.*, 903 N.E.2d at 458.

Here, the issue before us is the same as that before our Supreme Court in *In re B.H.*: whether the important and strong presumption that L.J.S.'s interests are best served by placement with Father has been clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with Grandparents. We hold that it has not.

The trial court's Order listed eighty-nine findings. The first fifty-seven findings pertained to Grandparents and Mother. The findings in pertinent part noted: conditions of Parents' Agreed Order regarding paternity; Father was temporarily delinquent in child support payments; Grandparents participated in the care of L.J.S. while he and Mother resided in their home; L.J.S.'s physical and emotional development were normal but that, with asthma, he should not be exposed to tobacco smoke; L.J.S. and Grandparents have a special bond; Grandparents take L.J.S. to church and that he has his own room at Grandparents' home, which is on a sixteen-acre farm with dogs; that L.J.S. has a relationship with Grandparents' extended family; that L.J.S. had experienced temporary stuttering when his visitation schedule was changed; that Grandparents have been married for thirty-two years and have lived in Holton for eleven years; that Grandparents are well-educated and have stable jobs; and that L.J.S. began living with Grandparents at birth and continues to reside with them. Finally, in finding fifty-seven, the trial court noted Mother's opinion that it would be in the best inter-

est of L.J.S. to live with Grandparents. While focusing on the positive attributes of Grandparents, these findings say nothing about Father's fitness as a parent nor do they suggest that Father abandoned L.J.S., relinquished his rights, or otherwise abdicated his parental authority. These findings were inadequate to clearly and convincingly overcome the important and strong presumption that L.J.S.'s interests are best served by placement with Father.

Findings 58 through 88 pertain more to Father and his actions.[3] These findings, in pertinent part, noted: Father had limited contact with L.J.S. during the first nine months of his life; Father had changed employment multiple times during L.J.S.'s life; Father was temporarily delinquent in child support payments; Father had failed to supply L.J.S. with a health insurance card; and that Father's current salary was $26.40 an hour plus overtime. While it is true that Father did not have much contact with L.J.S. for the first nine months, Father testified that he refrained from visiting because he did not know that L.J.S. was his son. *Tr.* at 159. It is also true that Father changed employment multiple times during the first few years of L.J.S.'s life. These changes, however, did not reflect on Father's unfitness or instability. Instead, these were conscious changes made by Father both to increase his salary and to enable him to live closer to L.J.S. The testimony revealed that Father took specialized training in Oklahoma and increased his salary from $21.00 to $26.40 per hour plus overtime. *Appellant's App.* at 156–57. Regarding the insurance card, Mother testified that Father supplied L.J.S. with a card, that she couldn't use it, and that "it was easier for

[her] to just get him on Medicaid." *Tr.* at 125.

The findings also noted: that Father had visited L.J.S. one week after he returned from job training in Oklahoma; that Father travelled to Kentucky to obtain Mother's signature on the proposed stipulation regarding a custody modification; that Father had kept L.J.S. for a longer visitation against Grandparents' wishes; that the stipulation was denied; that Father had exercised visitation through the date of the January 2009 hearing; that Father works in Kentucky but lives three hours away in Indiana; and that L.J.S.'s visitation with Father requires extensive driving. Again, none of these factors weigh against the presumptive custody of L.J.S. in Father. To the contrary, they reveal that Father continued at all times to be in contact with L.J.S., that he wanted custody of his son, that he retained an attorney to draft a stipulation providing for custody, that he travelled to Kentucky to obtain Mother's signature on the stipulation, and that he wanted to see L.J.S. enough to travel great distances.

The trial court also found: that Father smokes and, that while Father does not smoke in the house or car when L.J.S. is present, Father does not know if residual smoke affects L.J.S.'s asthma. There is no finding or showing that Father's smoking has exposed L.J.S. to harm or placed him at risk. In finding eighty-five, the trial court stated that Father has not acted as a custodial parent. This finding is immaterial to the issue of Father's fitness. Mother was the custodial parent, and Father had to coordinate his actions toward L.J.S. with her. In finding eighty-six, the trial court stated that Father has spent

---

**3.** Finding 89 did not pertain to the parties, but instead directed Father's child support payments to be increased to $129.00 per week, with an income withholding order issued that Mother should pay $59.00 per week in child support.

about two days a month with his son and has failed to follow the Order in the following ways—failed to provide the Child Support Division with his change of address; in the past, he has fallen behind in child support; has failed to provide L.J.S. health insurance; has failed to attend transparenting classes, and has failed to pay Mother birth expenses in a timely manner. The issues of child support and insurance cards were reiterations of facts previously found by the court. As to non-attendance of the transparenting class and reimbursement to Mother for L.J.S.'s birth, these factors do not, as the court concludes, establish Father's disregard for the welfare of L.J.S.

Finally, in findings eighty-seven and eighty-eight, the trial court reiterated that Father took L.J.S. for a ten-day visitation without Grandparents' consent and that placing L.J.S. with Grandparents will provide him with a stable environment with physical and mental stimulation that will afford him the opportunity to know and interact with both natural parents. As to the ten-day visit, although L.J.S.'s absence was against Grandparents' wishes, Father kept in touch with Grandparents, Mother was still the legal custodian, and Father had filed a stipulation that he believed would grant him legal custody. While it appears that Grandparents have provided a stable and good home for L.J.S., that was not the issue to be determined by the trial court. Rather, it was whether the important and strong presumption that L.J.S.'s interests are best served by placement with Father were clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with Grandparents.

Taken together, the specific findings made by the trial court are nothing more than "[a] generalized finding that a place-ment other than with the natural parent is in [the] child's best interests." *See In re B.H.,* 770 N.E.2d at 287. Our Supreme Court has held that this will "not be adequate to support such [a] determination." *Id.*

Here, the findings do not support the trial court's judgment and do not clearly and convincingly overcome the important and strong constitutional presumption that L.J.S. should be placed in Father's custody. Therefore, the trial court erred in granting custody of L.J.S. to Grandparents. We reverse and remand with instructions for the trial court to grant the custody of L.J.S. to Father, to order appropriate visitation and child support, and to take such other actions as the trial court deems necessary to grant Father the sole custody of L.J.S.

Reversed and remanded.

DARDEN, J., and MAY, J., concur.