

# IN THE
# Court of Appeals of Indiana

Tanzli Dangerfield,

*Appellant-Respondent*

v.

Davontae Suggs,

*Appellee-Petitioner*



FILED

May 06 2026, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

May 6, 2026

Court of Appeals Case No.
25A-MI-2105

Appeal from the Elkhart Superior Court

The Honorable David C. Bonfiglio, Judge

Trial Court Cause No.
20D06-2501-MI-2

---

**Opinion by Judge Weissmann**
Chief Judge Tavitas and Judge Foley concur.

**Weissmann, Judge.**

[1] After the breakup of his long-term romantic relationship with Tanzli Dangerfield ("Mother"), Davontae Suggs petitioned for visitation rights with her seven-year-old daughter, M.D. Though Suggs was not biologically related to M.D., he claimed a surrogate-father relationship with her, having lived with her for much of her life, supported her financially, and served as the only father figure she had ever known.

[2] The trial court held two hearings on the matter but never conducted a formal evidentiary presentation at either one. It appointed a guardian ad litem ("GAL") to assist in determining whether visitation was in M.D.'s best interest. Yet it never gave the parties an opportunity to question the GAL on the record about her recommendations. Critically, the court also never stated or applied the constitutionally mandated presumption that favors parents in proceedings where a third party seeks visitation over the parent's objection.

[3] At the conclusion of these summary proceedings, the trial court granted Suggs visitation rights. Mother appealed, arguing—among other things—that procedural irregularities in these proceedings deprived her of due process. We agree and reverse.

## Facts

[4] Mother and Suggs began living together after M.D. was born in October 2017. Paternity was never established for M.D., but the parties agree that Suggs is not

her biological father. Even so, M.D. calls Suggs her "dad" or "daddy," and Suggs's family embraced M.D. as one of their own. Tr. Vol. II, p. 61; App. Vol. II, p. 24. Suggs's niece, for instance, referred to M.D. as her cousin.

[5] During the approximately five years that Mother and Suggs were together, Suggs helped support M.D. by paying living and recreational expenses, providing medical insurance, and reportedly paying M.D.'s babysitter each week. His financial support continued even after the relationship ended; M.D. remained on his employer-sponsored insurance plan until Mother asked him to remove her so she could obtain Medicaid coverage instead.

[6] Following the breakup, Mother initially permitted Suggs to babysit M.D. and allowed some extended visits, although she reportedly conditioned certain visits on Suggs purchasing items for M.D. Suggs's relatives occasionally encountered M.D., who would ask them to "[t]ell my dad to come pick me up or tell my dad to come see me." App. Vol. II, p. 26. Mother also periodically stayed at Suggs's home with M.D. when she was experiencing difficulties with her new boyfriend.

[7] Mother eventually ended Suggs's visitation altogether, though Suggs continued to keep a bedroom in his home for M.D. When Suggs later encountered Mother and M.D. at a retail store, M.D. hugged him, called him "daddy," and asked to visit him. *Id.* Yet Mother sought a protective order based on that interaction. The action was dismissed after she failed to appear at the contested hearing Suggs requested.

[8] Suggs then retained counsel and petitioned for visitation, asserting that he had a custodial parental relationship with M.D. and that visitation was in her best interest. Mother, acting pro se, opposed the petition. In a writing filed with the trial court, she stated that she and Suggs had met the month after she became pregnant with M.D. and did not begin living together until M.D. was 1½ years old. She acknowledged that Suggs contributed toward household expenses during the periods they cohabited, though she characterized their time together as shorter than Suggs recalled. She also noted that she had temporarily moved out several times due to alleged physical abuse. She estimated that Suggs had seen or cared for M.D. only five or six times since March 2022.

[9] Mother described the bond between Suggs and M.D. as feeling "like a step parent (sic) bond and nothing more." *Id.* at 16. However, she claimed that M.D. hides and turns red rather than acting excited when she unexpectedly encounters Suggs. She contended that Suggs was seeking visitation only as a pretext to maintain contact with her and that he had never shown genuine interest in M.D.

[10] The trial court scheduled the first hearing on Suggs's petition for just fifteen minutes. Neither party was sworn in, and no formal evidence was presented. Suggs's counsel summarized his position and briefly recounted the relevant history. Mother offered her own account, which differed materially from Suggs's version on several points. Based solely on these unsworn statements, the court concluded that Suggs had established the first prong of the applicable

test—that he had a custodial parental relationship with M.D. The court explained its reasoning:

> So, it would appear that the first prong of the test, um, appears as if it is clearly clear (sic) – There was a custodial parental relationship at one time. The issue is is (sic) it in the best interest of the child, um, for the Court to order, um, third-party parenting time -- visitation. Visitation, actually, is a more-appropriate use of the term than parenting time.
>
> So, that's an objective standard. And, um, I don't think I -- I can simply make a decision just listening to both parties -- give me their side of the story.
>
> So, the best approach on determining best interest is for me to appoint an attorney Guardian Ad Litem to investigate the issue of what's in the child's best interest . . . .

Tr. Vol. II, p. 16.

[11] The court issued a written order requiring each party to pay fifty percent of the GAL's fee, subject to adjustment at the final hearing, and directing all parties to cooperate fully with the GAL's investigation and to allow her access to M.D.

[12] Mother initially appeared willing to cooperate but later texted the GAL to say that "this process is corrupt and she spoke with an attorney who said it's illegal." App. Vol. II, p. 25. Suggs, by contrast, cooperated fully. The GAL was able to

speak with him, his family members, and the babysitter who had cared for M.D. for years.[1]

[13] The GAL concluded in her report (GAL Report):

> I believe [Suggs] is genuine, believed he was this Child's father, and has held himself out as her father to the community. I do not believe he is a danger to the child in any way, but a benefit to her.
>
> I recommend [Suggs] be granted parenting time with the child one weekend per month from Friday at 6pm until Sunday at 6pm and one mid-week visit from after school until 7 pm or from 3-7 pm if school is not in session. If the visits go well[,] there can be a discussion of increasing their frequency.

*Id.* at 27.

[14] After reviewing the Report, the trial court directed the parties to advise by April 18, 2025, whether they agreed with its recommendations, and scheduled a hearing for May 21, 2025, if no agreement was reached. Settlement negotiations were still ongoing as of April 21; a week later, Suggs's counsel reported that the parties had not reached an agreement and that Mother had failed to respond to counsel's communications.

[15] Mother moved to continue the final hearing, asserting that she was awaiting paternity test results for M.D.'s biological father. Suggs objected, characterizing

---

[1] At the time of the GAL's interview, the babysitter was pregnant with a child fathered by one of Suggs's relatives.

the motion as another attempt to delay and obstruct the proceedings. The court denied the continuance, noting that Mother had not participated in the proposed settlement conference.

[16] At the final hearing, Suggs's counsel reported that Mother had instructed her not to communicate by email and had stated she would never sign anything Suggs's counsel "offered her." Tr. Vol. II, p. 27. Mother did not dispute these representations. The GAL then informed the court that she had attempted to schedule an appointment with Mother, who had called the proceedings illegal and refused to meet. The GAL stated that everyone she had been able to interview reported that M.D. loves Suggs and that he had taken better care of M.D. than Mother had. The GAL explained that the mid-week visits were intended to ensure "there's somebody, at least, looking out for her." *Id.* at 40.

[17] Mother disputed the GAL's account. She claimed the GAL told her she had to pay $700 or the GAL would "have to take [Suggs's] side" and "look at his evidence and presume him to be best interest (sic) of the child." *Id.* at 29. She also claimed to have contacted the GAL two days before the Report was issued to inquire about a $50 hourly rate the GAL had allegedly offered as an alternative but received no response. Mother reiterated her substantive objections to Suggs's visitation request.

[18] When Mother attempted to elaborate on the underlying facts, Suggs's counsel objected, and the trial court appeared to sustain the objection. It remarked that "the whole purpose of the Guardian Ad Litem is to avoid . . . this kind of

situation in the courtroom." *Id.* at 30. Mother protested that she was not being heard and was not being taken seriously.

[19] The GAL denied ever quoting a $50 hourly rate and disputed Mother's claim that she had attempted to contact her two days before the Report issued. She reiterated that Mother had consistently refused to meet and noted her practice of informing participants about financial assistance available to parents who cannot afford her fee. When Mother maintained she "wouldn't make something like that up," the court responded, "I think you are making it up." *Id.* at 32. The court then told Mother: "[The court] gave you the mechanism to have your voice heard and your child's voice heard [a]nd you just thumbed your nose at it." *Id.* After Mother denied doing so and again argued that Suggs had no legal rights with respect to M.D., the court declared that Suggs was "getting them today to have visitation"—even though no formal evidentiary presentation had occurred. *Id.*

[20] In its written order granting visitation, the court found that: (1) Suggs and Mother had been in a significant romantic relationship during which they lived together with M.D.; (2) Suggs had developed a parental-type relationship with M.D. and had continued to seek that relationship after the parties separated; and (3) despite his not being her biological father, Suggs had developed a loving relationship with M.D. and provided ongoing financial support after the separation. The court adopted the GAL's recommendations and awarded Suggs one weekend of visitation per month (Friday at 5:00 p.m. through Sunday at

5:00 p.m.) and one mid-week visit per week (after school until 7:00 p.m. during the school year; 3:00 p.m. to 7:00 p.m. when school was not in session).

[21] After counsel entered an appearance on Mother's behalf, she filed a motion to correct error arguing, among other things, that her due process rights were violated. The trial court denied the motion following a hearing, and Mother now appeals.

## Discussion and Decision

[22] Mother raises several issues on appeal, but one is dispositive: whether she was denied her right to due process. We find that she was, based on multiple irregularities in the proceedings, and we thus reverse and remand.

[23] Rulings on motions to correct error are ordinarily reviewed for abuse of discretion. *Boyd v. WHTIV, Inc.*, 997 N.E.2d 1108, 1110 (Ind. Ct. App. 2013). We reverse when the trial court's judgment is clearly against the logic and effect of the facts and circumstances before it or when the court misapplies the law. *In re Adoption of K.G.B.*, 18 N.E.3d 292, 296 (Ind. Ct. App. 2014). Questions of law, however, are reviewed de novo. *Id.*

## I. Third-Party Visitation

[24] Indiana courts apply a two-part common law test for determining whether to grant visitation to a non-parent. Under this framework, which evolved from *Collins v. Gilbreath*, 403 N.E.2d 921 (Ind. Ct. App. 1980), "the third party must establish the existence of a custodial and parental relationship and that

visitation would be in the children's best interest." *Francis v. Francis*, 654 N.E.2d 4, 7 (Ind. Ct. App. 1995). The first element goes to standing; the second "is the standard by which the question of visitation is adjudged after the cognizable right is established . . . " *Tinsley v. Plummer*, 519 N.E.2d 752, 754 (Ind. Ct. App. 1988). A party seeking visitation must satisfy the threshold requirement of a custodial and parental relationship before a court may proceed to the substance of the request. *Id.*

## II. The Constitutional Backdrop

[25] Overlaying this two-part test is a constitutional framework that guards the parent-child relationship. *In re L.J.S.*, 923 N.E.2d 458, 462 (Ind. Ct. App. 2010). The Fourteenth Amendment's Due Process Clause protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* (quoting *In re L.L.*, 745 N.E.2d 222, 228–29 (Ind. Ct. App. 2001)). And "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

[26] In custody and visitation proceedings, fit parents are presumed to act in their children's best interest. *Troxel v. Granville*, 530 U.S. 57, 68 (2000). So long as a parent adequately cares for her child, the State ordinarily has no basis to intrude into family decision-making. *Id.* at 68-69. Accordingly, a trial court considering a third-party visitation petition must give special weight to a fit parent's decision

to deny or limit contact and "some weight to the fact that a parent has previously agreed to some visitation." *Schaffer v. Schaffer*, 884 N.E.2d 423, 427 (Ind. Ct. App. 2008). In addition, the party seeking to override the parent's decision to deny or limit contact bears the burden of overcoming this parental presumption. *Brown v. Lunsford*, 63 N.E.3d 1057, 1065 (Ind. Ct. App. 2016).

## III. Mother's Due Process Claim

[27] Mother contends that the trial court violated her due process rights by failing to apply this parental presumption, failing to require Suggs to overcome it, and entering judgment without any evidentiary presentation.[2] Each of these irregularities, standing alone, would give us pause; taken together, they compel reversal.

[28] A parent's interest in the care, custody, and control of her child "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Troxel*, 530 U.S. at 65. Because this interest is fundamental, "a parent's interest in the accuracy and justice of the decision is commanding." *Thompson v. Clark Cty. Div. of Fam. & Child.*, 791 N.E.2d 792, 795 (Ind. Ct. App. 2003).

---

[2] Mother did not object to these alleged irregularities on the grounds that she alleged in her motion to correct errors and now raises on appeal. Errors not raised to the trial court before judgment but raised for the first time in a motion to correct error are generally waived for appeal. *Carmichael v. Separators, Inc.*, 148 N.E.3d 1048, 1058 (Ind. Ct. App. 2020). But because Mother's constitutional right to parent is at stake, we nonetheless choose to address the merits of this due process issue. *See Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 54 (Ind. 2013) ("[A] reviewing court may exercise its discretion to review a constitutional claim on its own accord.").

Appellate courts weigh three factors to determine what process is due in proceedings affecting parental rights: (1) the private interests at stake; (2) the risk of error created by the procedure used; and (3) the countervailing governmental interest in using that procedure. *In re G.P.*, 4 N.E.3d 1158, 1165–66 (Ind. 2014) (citing *Mathews*, 424 U.S. at 335). Both a parent's interest in raising her child and the State's parens patriae interest in a child's welfare are substantial, so due process claims in the context of parental rights cases ordinarily turn on the second consideration—the risk of error. *See In re I.P.*, 5 N.E.3d 750, 752 (Ind. 2014) (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). That is precisely where the proceedings here fell short.

## A. Failure to Apply the Parental Presumption.

The trial court applied the third-party visitation test without first tilting the scale in Mother's favor as constitutional requirements demand. *See Troxel*, 530 U.S. at 68. The court neither required Suggs to overcome the parental presumption that Mother's decision to end M.D.'s contact with Suggs was in M.D.'s best interest nor made any finding that Suggs had met that burden. These omissions alone justify reversal. Absent a finding of parental unfitness, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 U.S. at 72–73; *see also Crafton v. Gibson*, 752 N.E.2d 78, 98 (Ind. Ct. App. 2001) (reversing grandparent visitation order where trial court failed to apply the Fourteenth Amendment's parental presumption).

## B. Absence of Any Evidentiary Hearing.

[31] The irregularities do not end there. No formal presentation of evidence occurred at either hearing. At the first—scheduled for just fifteen minutes—Suggs's counsel briefly summarized his position while Mother, appearing pro se, offered a materially different account. Neither party was sworn in, and no witnesses testified. Despite these facts being sharply contested, the trial court found that Suggs had a custodial parental relationship with M.D. based solely on unsworn argument. That conclusion required an evidentiary foundation. Though "trial judges are granted latitude and deference in family law matters," a judge cannot fairly resolve disputed factual questions without evidence on those issues. *Brown*, 63 N.E.3d at 1062.

[32] The second hearing was no different. The court accepted the GAL's Report without affording either party an opportunity to present evidence, call witnesses, or cross-examine the GAL. When Mother attempted to address the underlying facts, Suggs objected, and the court sustained the objection based on Mother's failure to meet with the GAL. The court's best-interest finding thus also lacked any evidentiary foundation.

[33] We have previously recognized that "[t]he risk of error created by entering judgment after conducting a hearing as a summary proceeding where no witnesses testify and no cross-examination is conducted is substantial, in that the parent does not have an opportunity to present witnesses in his or her favor or to cross-examine opposing witnesses." *Thompson*, 791 N.E.2d at 795. That

same substantial risk of error is present here. *See Mathews*, 424 U.S. at 333 (noting that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner).[3]

## Conclusion

The trial court's proceedings did not comport with due process. Neither hearing included a formal presentation of evidence, and the court never applied—or required Suggs to overcome—the parental presumption mandated by the Fourteenth Amendment. We therefore reverse the trial court's judgment and remand for further proceedings consistent with this opinion, including a full evidentiary hearing and, if the trial court deems it advisable, an updated GAL Report in which both parties are ordered to participate.[4]

Reversed and remanded.

Tavitas, C.J., and Foley, J., concur.

---

[3] This opinion should not be interpreted to express any view on the merits of either party's claims regarding Suggs's petition for visitation. That decision is for the trial court to make after formal presentation of evidence in accordance with due process requirements and its application of applicable law.

[4] Given this disposition, we need not address Mother's other claims on appeal.

ATTORNEYS FOR APPELLANT

Peter L. Tomas Morgan
Indiana Legal Services
South Bend, Indiana

Amy Guillot
Indiana Legal Services
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

George T. Catanzarite
Stipp Law, LLC
South Bend, Indiana