In re the Matter of The Parent/Child Relationship Existing Between B.T. and A.T., (The Children) and Christine THOMPSON/Mother, Appellant–Respondent,

v.

CLARK COUNTY DIVISION OF FAMILY AND CHILDREN, Appellee–Petitioner.

No. 10A04–0210–JV–493.

Court of Appeals of Indiana.

July 16, 2003.

Jeffrey D. Stonebraker, Chief Public Defender, Jeffersonville, IN, Attorney for Appellant.

Rebecca L. Lockard, Jeffersonville, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Christine Thompson appeals the termination of her parental rights. Specifically, she contends that the trial court violated her due process rights by entering judgment against her without conducting a proper final termination hearing. Because the trial court conducted the hearing as a summary proceeding where no witnesses testified and no cross-examination was conducted, we conclude that Thompson's due process rights were violated. We therefore reverse the trial court and remand this case for a proper final termination hearing.

### Facts and Procedural History

Thompson has two children, B.T., who was born March 14, 1990, and A.T., who was born April 12, 1992. On February 9, 2001, the Clark County Division of Family and Children (DFC) filed petitions for the involuntary termination of Thompson's parental rights to both B.T. and A.T. Thompson, who was represented by counsel, appeared at the March 2001 initial hearing, and the final termination hearing was set

for June 2001. After a series of six continuances on behalf of Thompson and one continuance on behalf of the DFC, the final termination hearing was held on July 25, 2002. Just before the hearing was set to begin, Thompson called the trial court and said that she would be unable to make the hearing because she checked herself into The Healing Place, an alcohol and drug rehabilitation facility. Thompson's attorney requested a continuance, and the trial court tentatively agreed to continue the hearing upon verification that Thompson was indeed a patient at the facility. The court reporter then called The Healing Place and was told that Thompson was not a patient there now nor had she ever been a patient there. The trial court therefore denied Thompson's motion to continue and proceeded to conduct the final termination hearing in "an expedited manner" because Thompson "has failed to appear as a result of inexcusable neglect." Tr. p. 23, 24. Over the objection of Thompson's attorney, the court conducted a summary proceeding. Neither the DFC nor Thompson called any witnesses. Instead, the attorneys for both the DFC and Thompson gave summaries of what their witnesses would have testified to had a full hearing been conducted. Furthermore, the attorneys introduced various exhibits into evidence without sponsoring witnesses or foundations. After the summaries of the anticipated testimony, the trial court "grant[ed] the request by the Division of Family and Children for entry of a Default Judgment and thereby terminat[ed] the parental interest between the Natural Mother Christine Thompson and [B.T.]

and [A.T.]"[1] Tr. p. 38–39. This appeal ensued.

### Discussion and Decision

 Thompson challenges the termination of her parental rights on a number of grounds, one of which we restate and find dispositive: whether the trial court violated her due process rights by entering judgment in favor of the DFC after conducting a final termination hearing as a summary proceeding where no witnesses testified and no cross-examination was conducted. We first note that a parent does not have a constitutional right to be physically present at a final termination hearing. *See J.T. v. Marion County Office of Family & Children,* 740 N.E.2d 1261, 1264 (Ind.Ct.App.2000), *reh'g denied, trans. denied.* However, under Indiana Code § 31–35–2–6.5(e), which governs hearings for petitions to terminate a parent-child relationship, "[t]he court shall provide to a [parent] an opportunity to be heard and make recommendations to the court at the hearing. The right to be heard and to make recommendations under this subsection includes the right of a [parent] to submit a written statement to the court...." Furthermore, Indiana Code § 31–32–2–3(b) provides that in proceedings to terminate the parent-child relationship, "[a] parent, guardian, or custodian is entitled: (1) to cross-examine witnesses; (2) to obtain witnesses or tangible evidence by compulsory process; and (3) to introduce evidence on behalf of the parent, guardian, or custodian."

 In addition to these statutory provisions, the Due Process Clause of the

1. Even though the DFC requested a default judgment, and the trial court referred to its judgment as a default judgment, this case did not involve a true default judgment. *Young v. Elkhart County Office of Family & Children,* 704 N.E.2d 1065, 1068, (Ind.Ct.App.1999) ("Where an issue of fact exists between the parties, a default judgment is improper. The court may, however, proceed to hear evidence and, if a prima facie case is established, render the appropriate judgment. Such a judgment is a judgment on the merits.") (citations omitted).

United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *In re Paternity of M.G.S.*, 756 N.E.2d 990, 1004 (Ind.Ct.App.2001), *trans. denied.* When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *J.T,* 740 N.E.2d at 1264. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quotation omitted). The nature of process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.; A.P. v. Porter County Office of Family & Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000) (citing *Mathews,* 424 U.S. at 335, 96 S.Ct. 893), *reh'g denied, trans. denied.* The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 (quotation omitted).

■ In this case, both the private interests and the countervailing governmental interests that are affected by the proceeding are substantial. In particular, the action concerns a parent's interest in the care, custody, and control of his or her children, which has been recognized as one of the most valued relationships in our culture. *J.T.,* 740 N.E.2d at 1264. Moreover, it is well settled that the right to raise one's children is an essential, basic right that is more precious than property rights. *In re M.G.S.,* 756 N.E.2d at 1005. As such, a parent's interest in the accuracy and justice of the decision is commanding. *J.T.,* 740 N.E.2d at 1264. On the other hand, the State's *parens patriae* interest in protecting the welfare of the children involved is also significant. *Id.* Delays in the adjudication of a case impose significant costs upon the functions of the government as well as an intangible cost to the lives of the children involved. *Id.* Here, the final termination hearing was continued several times upon Thompson's request. And immediately before the final termination hearing was set to begin, Thompson sought yet another continuance and gave a false reason in support thereof.

■ When balancing the competing interests of a parent and the State, we must also consider the risk of error created by the challenged procedure. The risk of error created by entering judgment after conducting a hearing as a summary proceeding where no witnesses testify and no cross-examination is conducted is substantial, in that the parent does not have an opportunity to present witnesses in his or her favor or to cross-examine opposing witnesses. Consequently, the trial court may not have an accurate picture of the evidence before making its decision. Not only does Indiana Code § 31–32–2–3(b) provide that a parent in a proceeding to terminate the parent-child relationship "is entitled ... to cross-examine witnesses ... [and] to introduce evidence on [his or her] behalf," but cross-examination is "fundamental and essential to a fair trial." *Parker v. State,* 773 N.E.2d 867, 869 (Ind. Ct.App.2002). Indeed, cross-examination is the very way to test the evidence that the dissent assumes to be true.

We have previously recognized the importance in termination of parental rights cases of conducting a hearing that meets due process requirements. In *Pitts v.*

*Johnson County Department of Public Welfare,* 491 N.E.2d 1013 (Ind.Ct.App. 1986), the trial court entered default judgment against the mother without conducting a hearing. In fact, the mother was not permitted to speak, present evidence, or cross-examine opposing witnesses. The mother appealed contending that her due process rights were violated. After acknowledging that persons faced with forced dissolution of their parental rights have a more critical need for procedural protections, this Court concluded that a hearing is required when default judgment is entered. *Id.* at 1016. Because the mother did not receive the benefit of a hearing where she could present evidence or cross-examine opposing witnesses, the court concluded that "it is clear the trial court's action here violated procedural due process[.]" *Id.* at 1017. The court therefore reversed the entry of default judgment and remanded the case for further proceedings. *Id.*

Here, after the trial court denied Thompson's motion to continue, the attorney for the DFC asked the court to proceed in an expedited manner and enter judgment in its favor. Despite Thompson's attorney's objection to the nature of the proceeding, the trial court nevertheless proceeded to terminate Thompson's parental rights. *See Trout v. Trout,* 638 N.E.2d 1306, 1307–08 (Ind.Ct.App.1994) (opining that appellant waived any entitlement to relief from abbreviated hearing by failing to object but cautioning against the use of summary proceedings). While the trial court conducted a summary proceeding before entering judgment, it consisted of the attorneys for the DFC and Thompson giving summaries of the anticipated testimony and introducing exhibits into evidence without sponsoring witnesses or foundations. Included among the DFC's exhibits were a psychological evaluation, which was hearsay, and seven of the court's previous orders, which educated the court on Thompson's past failings but did not speak to her present ability to properly care for her children. Further, no witnesses testified and no cross-examination was conducted.

Although we agree with the dissent that Thompson should not be rewarded for her deception and delay tactics, the trial court could have conducted the final termination hearing in her absence where witnesses testified, cross-examination was conducted, and exhibits were properly admitted into evidence. Essentially, what happened here was no hearing at all. After balancing the substantial interest of Thompson with that of the State and in light of the substantial risk of error created by the challenged procedure, we conclude that the trial court's entry of judgment terminating Thompson's parental rights in this manner denied Thompson due process of law and violated the provision of Indiana Code § 31–32–2–3(b), which provides Thompson the opportunity to cross examine witnesses. Even though Thompson was given the opportunity to be heard at a meaningful time, she was not given the opportunity to be heard in a meaningful manner. As the dissent highlights, our decision will delay the children's permanency. This is unfortunate but, nonetheless, required in an action as serious and intrusive as the termination of parental rights. We therefore reverse the entry of judgment terminating Thompson's parental rights and remand this case to the trial court with instructions to hold a proper final termination hearing.

Reversed and remanded.

ROBB, J., concurs.

FRIEDLANDER, J., dissents with separate opinion.

FRIEDLANDER, Judge, dissenting.

I respectfully disagree with my colleagues, whose decision to reverse is based upon the view that the termination hearing was inadequate, and indeed amounted to "no hearing at all." Op. at 796. I believe there was a hearing, and that, under the circumstances of this case, that hearing did not deprive Thompson of her due process rights.

The majority cites *Pitts v. Johnson County Dept. of Public Welfare*, 491 N.E.2d 1013 (Ind.Ct.App.1986) in noting "the importance in termination of parental rights cases of conducting a hearing that meets due process requirements." Op. at 795. That statement is true, of course. As a boilerplate principle, however, it provides little guidance in this case. Moreover, I perceive no similarity between the dispositive facts in *Pitts* and those before us here. In *Pitts*, there was *no* hearing, whether inadequate, superficial, or otherwise. Rather, it is a fair summary to say that Pitts was generally uncooperative with the trial court over a period of time. Eventually, that uncooperativeness included what amounted to stonewalling an investigation by the Johnson County Department of Public Welfare (the DPW) in relation to a termination of parental rights proceeding initiated against Pitts. It appears that the trial court finally grew tired of Pitts's actions and simply entered a default judgment in the termination proceeding.

The *Pitts* opinion does not provide much in the way of details about that case. From what little is discussed, it appears that Pitts's stonewalling behavior effectively prevented the DPW from gleaning information relevant to assessing Pitts's fitness as a parent. In that case, then, the default judgment, entered as it was without a hearing *of any kind*, was based upon incomplete data and seems to me to have been almost punitive in nature. That is certainly not acceptable, but it is not the situation before us here.

In *Young v. Elkhart County Office of Family and Children*, 704 N.E.2d 1065 (Ind.Ct.App.1999), we noted that default judgment is inappropriate where, as here, the party has filed a responsive pleading. Although the party need not attend that hearing, a hearing must nevertheless be conducted at which evidence is presented that is sufficient to establish all of the elements necessary for termination. *Id.* I believe such a hearing was held in this case, as will be explained more fully below. In my view, although the Clark County Division of Family and Children (CDFC) and the court in the instant case invoked the phrase "default judgment", that label is not descriptive of what occurred here and therefore is not accurate. This case should not turn on such semantic distinctions.

This question must be considered in relation to its facts. In May 1996, Thompson was kicked out of her mother's home and her children were placed in foster care because of Thompson's crack cocaine use. Thompson was asked to participate in drug and alcohol treatment. She did so only sporadically, and the children remained in foster care until September 1997. From April through September of 1998, authorities received numerous reports of educational neglect concerning Thompson. Those reports were substantiated in October 1998, when it was learned that Thompson often slept in late and did not get her children to school. Things improved until April 1999, when the same problem was reported and substantiated. In August 1999, authorities received reports that Thompson was again using drugs, and that she was being evicted from her home. She was in jail on October 25, 1999, when Clark Superior Court issued an emergency

order to take Thompson's children into protective custody. Following a hearing two days later, the court ruled that there was probable cause to support the filing of a petition alleging the children to be Children In Need of Services (CHINS) and the children were again placed in foster care. A CHINS petition to that effect was filed on that same day.

On May 31, 2000, following a hearing, the children were adjudicated CHINS and the court ordered that they remain in foster care until they could be reunified with Thompson. Later that year, the court entered an *Entry on December 5, 2000, Periodic Review and Permanency Plan*. In that entry, the court determined that the children should remain in foster care. The court also ordered Thompson to complete a drug and alcohol treatment program at TenBroeck, and to submit to random urine drug screens at the request of the CDFC. After a periodic review hearing, the court recorded an October 4, 2001 entry ordering that the children remain in foster care and again ordering Thompson to participate in a drug and alcohol treatment program. The court determined that it would be contrary to the children's welfare to live with Thompson, and the court ordered Thompson to obtain and maintain housing that would be appropriate for the children. The court issued a similar ruling following the next periodic review hearing, which occurred on April 4, 2002. Thompson was again ordered to actively participate in a drug and alcohol treatment program, and also to complete parent education classes and obtain and maintain appropriate housing. For the first time, no doubt because of Thompson's consistent failure to adhere to the court's previous orders to address her substance abuse and housing issues, the CDFC's permanency plan was identified as "termination of parental rights then adoption or guardianship." *Exhibits, Volume 3 of 3*, Petitioner's Exhibit 7.

From approximately October 24, 1999 until the date of the hearing in dispute here, Thompson did not complete any of the court-ordered substance abuse programs. She did not maintain a stable residence, but instead moved from one place to another. She was not cooperative during that time with respect to submitting to random urine drug screens. She did not complete parenting classes. She attended visitation with her children only sporadically, and there were periods of time when she failed to maintain contact with the Family Case Manager assigned to her case.

Finally, I note that in the twelve-month period leading up to the final hearing that is in dispute here, Thompson sought and was granted six separate requests for continuance. The last two of those requests are significant, and illustrative of the problem facing the court in resolving this case. A hearing on the CDFC's petition to terminate parental rights was scheduled for June 4, 2002. The day before that, on June 3, Thompson checked into LifeSprings, a substance abuse treatment facility, for a thirty-day commitment. She requested a continuance, which was granted, and then checked out of the facility within three days. The termination hearing at issue here was rescheduled for July 25, 2002. On that day, Thompson contacted both the court and her attorney and claimed that, the day before, she had checked herself into The Healing Place, a drug and alcohol abuse treatment facility. She requested another continuance. Thompson's phone call came while the court was convened on an unrelated matter, so the court asked the court reporter to get the phone number of the facility for purposes of speaking with Thompson when court was adjourned. Thompson provided two phone numbers. The court was inclined to grant the request, Thompson's seventh in approxi-

mately thirteen months, upon verification that she was indeed a patient at The Healing Place. The court reporter, Lori Ehringer, was instructed to call the facility and verify Thompson's commitment, including the admission date and proposed release date. Ehringer attempted to do that and spoke with Robin Winters, a volunteer at The Healing Place. Ehringer provided Winters with Thompson's name and social security number. Winters checked and determined that Thompson was not at the facility and had never been there. Thompson's attorney cross-examined Ehringer and asked whether Thompson had called the second phone number Thompson had provided for The Healing Place. Ehringer responded that the other number was for a men's facility, and the one she had called was for the women's facility, where Thompson obviously would be staying if she were a patient.

After Ehringer's testimony, the court denied Thompson's motion for continuance. That ruling was obviously based upon the conclusion that Thompson had lied to the court concerning her whereabouts. It was against this factual backdrop that the termination hearing commenced. My colleagues characterize the subsequent proceeding as "no hearing at all." *Op.* at 796. I cannot agree with that assessment. I believe the termination hearing was sufficient to establish all of the elements necessary for the termination of parental rights, and also was consistent with due process principles.

First and foremost, Thompson was represented by Mitchele Harlan at the termination hearing. Harlan was not a passive observer. Rather, he actively participated throughout the hearing. He requested a continuance on Thompson's behalf. He cross-examined Ehringer to assure that she had made every attempt to verify that Thompson had been admitted to The Healing Place.[2] He registered a continuing objection to the court's denial of the request for continuance. He opposed the CDFC's request for default judgment. He presented argument on Thompson's behalf in opposing termination. In short, Harlan admirably represented Thompson's interests to the greatest extent possible under the circumstances, and was impeded in that representation only by Thompson's general uncooperativeness in the months preceding the final hearing, which of course was reflected in and compounded by her absence from the final hearing. My colleagues and I all agree that Thompson's absence is not in and of itself an impediment to a judgment terminating her parental rights. *See Young v. Elkhart County Office of Family and Children,* 704 N.E.2d 1065. Thus, as I see it, the question is whether the hearing was of the sort envisioned in *Young,* viz., one at which the court heard evidence relevant to contested issues of fact, such that the court was able to render an appropriate judgment on the merits.

My colleagues disapprove of the manner in which some of the evidence was presented, that being by way of summarization on the part of Harlan and counsel for the CDFC. It is true that, although the witnesses were present, "no witnesses testified and no cross-examination was conducted." *Op.* at 795. This is not to say, however, that there was not evidence placed before the court. The appellate materials include eight exhibits offered by the CDFC and two offered on behalf of Thompson. Included in those exhibits are an October 25, 1999 emergency custody

2. It is apparent that Harlan was as much in the dark about his client's whereabouts and activities as was the court and the CDFC.

order, an October 27, 1999 entry summarizing that date's detention hearing, the CHINS petition, an Agreed Entry on Fact Finding Hearing and Dispositional Decree (May 31, 2000), entries pertaining to periodic review and permanency plan hearings that were held on October 5, 2000, October 4, 2001, and April 4, 2002, and copies of the medical records of B.T. and A.T. (the latter two introduced by Harlan on behalf of Thompson).

Read together, the foregoing exhibits illuminate the situation confronting the court when making the termination decision. Namely, Thompson has a longstanding substance abuse problem that to a large extent negates her ability to parent her children in an effective manner. The exhibits reflect that despite repeated court orders and the offer of services to address that addiction, Thompson has resisted treatment and made no progress in overcoming her problems. In fact, the exhibits bespeak a general lack of cooperation on Thompson's part with the CDFC. The exhibits further reflect that Thompson has not progressed in the matter of securing housing that would be appropriate for the children. An evaluation conducted by Dr. David Winsch, a clinical psychologist, concluded that in addition to substance abuse problems, Thompson

provided information suggesting that she has significant levels of anxiety, has had depression, experiences racing thoughts, has some grandiosity in thinking, has difficulty focusing and completing projects, has impaired sleep, and in general appears to be experiencing significant levels of psychological distress. In contrast, her reports on the questionnaires reflect that she does not experience. clinically significant levels of anxiety or depression and she was reluctant to admit to any personal problems on the personality questionnaires. Because of this inconsistent information, it is dif-

ficult to completely and accurately diagnose Ms. Thompson's conditions [sic]. In particular her description of drug use is very contrary to reports provided by the DFC. This examiner's clinical impression is that Ms. Thompson's facts change with her needs.

Records would suggest that Ms. Thompson is unlikely to change in a substantial way to become a consistent and responsible caretaker to her children.

*Exhibits, Volume 3 of 3,* Petitioner's Exhibit 8. Noting Thompson's "longstanding and serious lack of provision and care of her children" and that "there is little likelihood that she will improve to the point of being a consistent and stable caretaker", Dr. Winsch opined that "termination of parental rights may be in the children's best interests." *Id.*

The CDFC's attorney then identified and summarized the proposed testimony of the witnesses who were present and prepared to testify. Thompson's Family Case Manager would testify that Thompson was "very sporadic" in her contact with the CDFC, had refused to cooperate with respect to remedial services, had disappeared for "long periods of time", and did not complete parenting classes. *Transcript of Termination of Parental Rights Hearing (Transcript)* at 28. The Case Manager would also testify that Thompson failed to appear at "a majority" of the scheduled visits with her children while they were in foster care. *Id.* at 29. On some of those occasions when Thompson did show up for visitation, she was either intoxicated or arrived late or left early.

The Case Manager would testify that the children's behavior had improved since being placed in foster care and that Thompson continued to be a disruptive influence on the children. The CDFC would have called Vera Parish, the chil-

dren's foster parent and Thompson's sister, to describe Thompson's disruptive and inappropriate behavior during visitation with the children. Counsel informed the court that CASA personnel would testify to their belief that termination of parental rights would be in the children's best interests. The CASA report itself was entered into the record. It detailed Thompson's significant criminal history, her longstanding substance abuse problems, her lack of effort in addressing the various issues that impact her fitness as a parent, and her lack of cooperation with groups and agencies attempting to aid her in addressing those issues. The report summarized Thompson's situation as follows: "Christine has a history of noncompliance with CPS, and a reputation for hosting a kind of hangout place for drug and alcohol users. Educational neglect, lack of food, shelter and clothing, environment life/health have all been substantiated against Christine Thompson." *Appellant's Appendix* at 29.

When the CDFC concluded its presentation, Harlan summarized the evidence he proposed to present on Thompson's behalf. He proposed to present two witnesses who would testify that Thompson and Parish's relationship was a stormy one, suggesting the acrimony in that relationship motivated Parish's testimony concerning Thompson's negative influence on the children. Harlan also discussed factors that he believed might have influenced Dr. Winsch's recommendation that termination of custody may be in the children's best interests. Harlan also explained that he would have introduced the medical reports relative to the children. The court then asked, "If ... your client had been here and if the witnesses had stayed this is what we would have heard?" *Id.* at 38. Harlan responded, "Correct and obviously hopefully we would have heard some things from Ms. Thompson of positive things she was doing. Certainly she's not here." *Id.*

In summary, the court conducted a scheduled hearing from which Thompson knowingly and voluntarily absented herself. Notwithstanding her absence, Thompson was represented at the hearing by legal counsel, who acquitted himself well under the circumstances in advocating for his client. He argued for a continuance and objected to the denial of that request. He opposed the petition for termination to the greatest extent possible considering that his client chose not to attend the hearing. With respect to that absence, the record permits a reasonable inference that Thompson had been actively seeking to postpone the termination proceeding for more than a year, and there is reason to believe that she would continue to do so. Her last two attempts at delay (one of which was successful) involved deceiving the court—first with respect to her intentions, and then with respect to her whereabouts. Eight duly admitted exhibits provided strong and compelling evidence of her intractable unwillingness or inability to address significant personal characteristics and behaviors that render her an unfit parent. The witnesses whose proposed testimony the attorneys summarized would appear to me to have served the purpose only of corroborating the contents of the exhibits.

Not only was the proposed testimony entirely consistent with the information and opinions contained in the exhibits, but I am at a loss to understand how cross-examination of those witnesses would have benefited Thompson's case. The only possible source of evidence that could have benefited Thompson was Thompson herself. She might have presented evidence that, for instance, she was seeking treatment for her addiction or otherwise attempting to address and modify her

problematic conduct, in all of its manifestations. Thompson's longstanding pattern of behavior and her very absence from the hearing provided mute testimony that such evidence was not forthcoming. In fact, I believe it is in this particular area that the majority and I are most in fundamental disagreement. The majority believes that Thompson "was not given the opportunity to be heard in a meaningful manner." Op. at 796. To the contrary, the record reflects that Thompson was given one opportunity after another to present her case, but she consistently and actively eschewed those opportunities through deceit and subterfuge. In the end, as a direct result of Thompson's actions, it was left to her attorney to represent her interests without her assistance. We cannot craft a rule for such circumstances that results in the children, child welfare personnel, and indeed our courts, being held hostage to this deliberate course of conduct whose goal is the very relief granted today by the majority, viz., further delay.

Even assuming for the sake of argument that the summary of proposed testimony was improper, the exhibits provided sufficient evidence to support termination. In my view, due process principles do not require that Thompson be rewarded for her deception and her ongoing delaying tactics. She was entitled to a hearing at which her interests were adequately represented, and termination was not appropriate unless it was supported by competent evidence. She received such a hearing and such evidence was presented.

Finally, I cannot forget that there are other parties to consider in this situation. A.T. and B.T. have waited for years for their mother to change her life, but to no avail. Although they have not lived in her home for several years now, she continues to be a disruptive influence and a source of agitation for them. It seems to me that the majority has fashioned a rule (viz., requiring that witnesses be placed under oath to testify at a termination hearing) that serves no practical purpose I can see other than to leave B.T. and A.T. in limbo—and in turmoil—for a little while longer.

On the facts of this case, I believe the hearing comported with due process principles, and I would affirm the termination of Thompson's parental rights.

