**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 17 2012, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CHARLES W. LAHEY**
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**HOLLY M. DENEVE**
South Bend, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| E.M.R. (Minor Child), | ) ) | |
| AND | ) ) | |
| V.H. (Mother) & M.R. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| Vs. | ) ) | No. 71A03-1110-JT-494 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellant-Plaintiff, | ) | |

**July 17, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Respondents, V.H. (Mother) and M.R. (Father), appeal the trial court's termination of their parental rights to their minor child, E.M.R.

We affirm.

ISSUES

Mother and Father raise two issues, which we restate as:

(1) Whether the trial court's findings of fact support the trial court's termination of their parental rights to E.M.R.; and

(2) Whether the trial court erred in finding that DCS had provided a satisfactory plan for E.M.R.'s care and treatment.

Mother separately raises an additional issue, which we restate as: Whether the trial court abused its discretion when it denied Mother's petition for an updated interview.

Father separately raises an additional issue, which we restate as: Whether the trial court abused its discretion when it allowed DCS to submit evidence from a breathalyzer

test without confirming that the breathalyzer had been calibrated within the week that the test was performed.

FACTS AND PROCEDURAL HISTORY

Mother and Father are the parents of E.M.R., born September 17, 2008. Although Father was incarcerated when Mother gave birth to E.M.R., he was released approximately two weeks later. Shortly after his release, Father got into a physical altercation with his mother while she was holding E.M.R. As a result of the altercation, the Department of Child Services (DCS) entered into an informal adjustment with Mother and Father. Pursuant to the adjustment, Father was not allowed to be around E.M.R. unless Mother was also present to supervise.

After Father's release from incarceration, Mother initially lived with him at his mother's house. However, because Mother and Father argued frequently, Mother and E.M.R. moved in with Mother's mother. On February 22, 2009, when E.M.R. was approximately five months old, Father called Mother and asked her to come over to his house so that he could see E.M.R. Mother complied. While she was at Father's house, Father's brother visited and started a fight with Father. Mother grabbed E.M.R. and left the room. Meanwhile, Father's brother pulled out a gun. Father left the house and called the police from a neighbor's house, but his brother left before the police responded.

Upon their arrival, the police officers discovered that Mother and Father were intoxicated. At the time, Father was 24 years old and Mother was 19. The officers administered an alcohol breath test to Mother and found that she had a blood alcohol

3

level of 0.180. An officer told Mother that because she had been drinking and was underage, he could take away E.M.R. Mother stood up and responded that no one was going to take her baby away. One of the police officers grabbed her arm and Mother "threw" E.M.R., who hit a couch approximately four to eight feet away. (Vol. I Transcript p. 40).[1] The police observed E.M.R. strike the couch head-first, while his legs bent back over his head. Father grabbed E.M.R. before E.M.R. subsequently hit the floor.

As a result of this incident, Mother was arrested for underage consumption of alcohol, Father was arrested for distributing to a minor, and E.M.R. was taken to a hospital. E.M.R.'s only injury from the throw was an abrasion to his left eyebrow. When E.M.R. was released from the hospital, DCS placed him into foster care, where he has remained since. Father spent three days in jail, but ultimately the State did not file any charges against him and dismissed his case. The State charged Mother with felony child neglect and misdemeanor underage consumption of alcohol. Mother was convicted of child neglect and served five days in jail. She was also sentenced to four years of probation.

On March 2, 2009, DCS filed a petition alleging that E.M.R. was a child in need of services (CHINS). On March 4, 2009, Mother and Father admitted to the allegations

---

[1] One volume of the trial court's transcripts contains the October 19, 2010 and January 13, 2011 hearing transcripts, consecutively paginated, and another volume includes the September 15 and September 30, 2011 transcripts, consecutively paginated. We will address the first volume as Vol. I transcript and the second as Vol. II transcript.

and the trial court adjudicated E.M.R. to be a CHINS. On April 6, 2009, the trial court held a dispositional hearing and ordered Mother and Father to: (1) submit to random drug screens; (2) complete parenting assessments and parenting classes; and (3) maintain stable employment and/or income and adequate housing. The trial court also ordered Mother to complete high school or obtain her GED.

In April and May of 2009, Dr. Alan Wax, Ph.D. (Dr. Wax) conducted psychoparenting assessments of Mother and Father. Dr. Wax had seven concerns about Mother as a result of his assessment: (1) that based on Mother's history, she would not be able to complete her probation without getting into further trouble, which would cause a disruption in her bond with E.M.R.; (2) that she might have bipolar disorder, which could manifest in periodic impulsive and rash behaviors; (3) her history of alcohol addiction and abuse; (4) her extremely low score on the parenting assessment; (5) her history of fighting with Father, which Dr. Wax felt would not provide a good environment for E.M.R.; (6) her failure to keep appointments; and (7) that there were inconsistencies between Mother's story concerning the night that she was arrested, Father's story concerning the same night, and DCS' report.

With regard to Father, Dr. Wax had similar concerns. He noted that Father had a history of alcohol abuse and that Father had low scores on his parenting assessment. In addition, Dr. Wax noted that Father had problems with anger and impulse control, as well as unmanaged depression. Finally, Dr. Wax mentioned that Father's environment was bad for him, both as it related to encouraging the possibility of a relapse and as to its

5

propriety for E.M.R. Dr. Wax recommended that Father complete substance abuse treatment and aftercare, attend AA meetings, complete anger management classes, and receive counseling.

On July 8, 2009, the trial court modified its dispositional order to include Dr. Wax's recommendations and further required Mother to complete individual counseling, attend AA meetings at least twice a week, and successfully complete probation. In addition to Father's original requirements, the trial court ordered Father to complete the Batterer's Intervention Program (BIP) and individual counseling, to attend weekly AA meetings, and to obtain suitable housing away from persons addicted to drugs or alcohol.

Pursuant to the order, Father completed a chemical dependency evaluation and was recommended to attend a modified intensive outpatient program (IOP) twice a week, followed by a twelve week program of after-care that would meet once a week. He was also recommended to attend a minimum of one AA meeting per week. Michelle Haas (Haas), a Chemical Dependency Counselor at the Family and Children's Center in South Bend, Indiana, began working with Father in May of 2009. She testified that Father's attendance was inconsistent throughout his IOP and that he did not attend the mandatory AA meetings at first. Father also had one relapse at the beginning of the program. Nevertheless, towards the end of the program, Haas noticed that Father had increased motivation and seemed to be "trying to maintain some abstinence." (Vol. I Tr. p. 16).

On August 9, 2009, Father finished the IOP requirements, even though it took him a month longer than expected due to his inconsistent attendance. However, Father did

6

not complete the after-care portion of the program and, therefore, did not officially complete the program since the after-care was considered an integral component of the overall requirements. On October 29, 2009, Haas met with Father and noticed that Father appeared extremely intoxicated. She tested Father with a breathalyzer and found that he had a blood alcohol level of 0.101. Accordingly, Haas told Father that she could not conduct a session with him because he was drunk. Father left her office, and Haas later received notice that Father had been incarcerated for charges of driving under the influence. On November 23, 2009, Haas discharged Father for non-compliance.

At a later date, Father requested to restart the program. Accordingly, on December 29, 2009, Haas again met with Father for an individual session. She informed him that she was increasing his services to three times per week, that he had to restart the program from the beginning, and that he had to attend a minimum of two AA meetings per week. Father signed a contract acknowledging that he would be discharged from the program again if he missed any of his classes or meetings for any reason. On December 30, 2009, Father was convicted of battery for an incident of domestic violence against Mother and was incarcerated for six months. As a result, Haas again discharged him from the IOP.

With regards to the Batterer's Intervention Program (BIP), Father attended orientation on October 20, 2009 and a group session on October 22, 2009. Then, after Father blew a 0.101 on the breathalyzer during his individual therapy session with Haas on October 29, 2009, Father left the facility and did not return to his BIP group.

Consequently, on November 25, 2009, he was discharged for excessive absences. One year later, shortly prior to the termination hearing, Father returned to the BIP and went through group orientation on October 12, 2010. At the time of the first termination hearing, he was still in the process of resuming the BIP.

Like Father, Mother's participation in services was inconsistent. Sheryl Talbott, an addictions specialist, conducted a substance abuse assessment of Mother in February of 2010 and recommended that she attend an IOP. Mother began treatment in the IOP, but was non-compliant and suspended from the program due to poor attendance. In order to resume the treatment, Mother was required to provide verification of attendance at a number of AA meetings, but she falsified those verification documents and was discharged from the program. Subsequently, Mother was discharged from a substance abuse program at YWCA for noncompliance with rules and for inadequate attendance.

During the CHINS and termination proceedings, Mother also continued her involvement in criminal activity. Around October of 2009, Mother was convicted of conversion and was incarcerated for approximately two weeks. On June 17, 2010, Mother was convicted of theft for stealing alcohol. As a result, Mother was charged with violating her probation for her child neglect conviction and was incarcerated for four months. On October 11, 2010, she was released from incarceration and was placed under house arrest in Community Corrections.

On May 6, 2010, DCS filed a petition requesting the involuntary termination of Mother and Father's parental rights as a result of their failure to complete services. On

October 19, 2010, the trial court conducted a hearing. At the hearing, Mother testified that she had remained sober for the previous four and a half months, although she admitted that she had spent four of those months incarcerated. She also testified that she was resuming treatment for her addiction to alcohol and had started her classes to receive her GED. Father testified that he had completed some of the services, including parenting classes, a parenting assessment, and all but the after-care portion of the IOP. He was also preparing to begin classes at Ivy Technical College.

At the close of the presentation of the evidence, the trial court continued the hearing so that Dr. Wax, who was absent, could testify at a later date. On January 13, 2011, the trial court reconvened and Dr. Wax testified. The following day, the trial court issued an order taking the matter under advisement for a period of eight months and set a status hearing for September 15, 2011. The trial court ordered the parents to be 100% compliant with services during the eight month time period, including: (1) submitting to random drug and/or alcohol screens; (2) providing proof of regular, consistent attendance at AA meetings; (3) completing an IOP or the IOP after-care; (4) regularly attending parenting classes and individual therapy; (5) completing medication consultations and following all instructions with regard to the prescribed medicines; (6) continuing visitations with E.M.R.; and (7) completing and providing proof of job applications and searches. The trial court also required Father to attend and complete the BIP.

Over the following eight months, Mother and Father completed some of the services ordered by the trial court. Mother completed her IOP, a psychiatric evaluation,

9

and parenting classes. She also enrolled in the Young Mother's Program, which is a home-based case management program that helps young mothers in areas such as housing, education, employment, and parenting. However, Mother was not 100% compliant with services. Mother missed several appointments with the Young Mother's Program in July and August of 2011, missed a follow-up psychiatric appointment, failed to show up for individual therapy appointments on three occasions, and cancelled multiple visits with E.M.R. On July 4, 2011, Mother relapsed and tested positive for alcohol.

In addition, Mother became pregnant with another child. She met the father, G.M., through her substance abuse classes. Mother planned the pregnancy and chose G.M. as the father. On September 12, 2011, E.M.R.'s court appointed special advocate, Judy Lane (Lane), reported to the trial court that she was concerned that the pregnancy was not in E.M.R.'s best interests and demonstrated Mother's immaturity. Her opinion was based on the fact that at the time of Mother's decision to become pregnant, Mother did not have stable housing, was not employed, and was likely to have a hard time gaining employment due to her previous felony conviction. In addition, Lane was concerned because at the time of her report, G.M. was "[o]n the run" from authorities for violating his work release. (Vol. II Tr. p. 37).

Father completed many of his court-ordered services, including parenting classes, the IOP, and the BIP. By the end of the eight months he had also begun classes at Ivy Technical College and employment at Rally's. However, like Mother, Father missed a

follow-up psychiatric appointment, failed to show up for individual therapy appointments, and cancelled multiple visits with E.M.R. On July 3, 2011, Father relapsed and consumed alcohol. That night, Father's mother called the police and told them that she did not want Father in her house because he was intoxicated. The police arrested Father and charged him with public intoxication, resisting arrest, disorderly conduct, and battery.

On September 15 and 30, 2011, the trial court held a status hearing regarding DCS' petition to terminate Mother and Father's parental rights. At the time of the September 15, 2011 hearing, Father's charges stemming from the July 3, 2011 incident were still pending. At the conclusion of the evidence, the trial court took the matter under advisement and on October 13, 2011, the trial court issued an order to terminate Mother and Father's parental rights to E.M.R.

Mother and Father now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

We recognize that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id.* However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a

11

termination of a parent-child relationship. *In re J.H.,* 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *Id.* We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Where, as here, the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's position to assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id.*

## I. *Findings of Fact*

Mother and Father's first argument on appeal is that the trial court's judgment is erroneous because it was supported by an erroneous finding of fact. The trial court's finding of fact number five stated that "[m]edical professionals noted that [E.M.R.] had sustained a skull fracture that was healing at the time of removal." (Appellant's App. p. 7). As Mother and Father note, Roberta Hibbard, a professor of pediatrics at the Indiana School of Medicine, evaluated E.M.R.'s case and determined that the alleged skull fracture was instead a bruise.

We agree with Mother and Father that this finding was erroneous. However, we conclude that the error was harmless as the remaining findings of fact are more than sufficient to support the trial court's judgment. In order to terminate Mother and Father's parental rights, DCS was required to prove by clear and convincing evidence:

> (B) that one of the following [was] true:
> (i) There [was] a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents [would] not be remedied.
> (ii) There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child.
> (iii) The child [had], on two (2) separate occasions, been adjudicated [] in need of services[.]
> (C) that termination [was] in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B), -(C); *Bester v. Lake Cnty. Office of Family and Children,* 839 N.E.2d 143, 148 (Ind. 2005). Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy,* 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parent[] is wholly inadequate for the child's very survival." *Bester,* 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1233 (Ind. 1992)). Rather, it is sufficient to show that the child's emotional and physical development are threatened by the parent's custody. *Id.*

The trial court here found that the conditions that led to E.M.R.'s removal and continued placement outside of the parents' home would not be remedied. We have held that when determining whether there is a reasonable probability that a parent will not

13

remedy the conditions justifying a child's removal from the home, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. *Rowlett v. Vanderburgh Cnty. Office of Family and Children,* 841 N.E.2d 615, 621 (Ind. Ct. App. 2006). The trial court must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *C.T. v. Marion Cnty. Dept. of Child Services,* 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans. denied.* DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.* (quoting *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

Notwithstanding the trial court's erroneous finding of fact number five, the trial court also found that:

> 3. The original reason for involvement by the DCS included alcohol abuse by both parents.
>
> 4. Alcohol abuse remains a problem for both parents.
>
> *   *   *
>
> 13. A status hearing was held regarding the completion of services on September 15, 2011 and completed on September 30, 2011.
>
> 14. Several services ordered by the [c]ourt had not been completed.
>
> 15. Neither parent has complied sufficiently with orders of the [c]ourt to progress to visits within their homes.
>
> 16. [Dr. Wax], who conducted psychoparenting assessments of both parents, noted "grave concerns" regarding their ability to parent [E.M.R.].
>
> 17. Mother remains on probation while Father is facing criminal charges.

14

18. E.M.R. has not bonded with his parents.

19. Mother chose to become pregnant again while involved with the DuComb Center, a local agency supervising her probation. The father of the unborn child is a convicted felon and is currently "on the run."

20. Father has an upcoming hearing on his criminal charges.

21. E.M.R.'s lack of relationship with his parents exists, at least in part, due to the occasions when the parents have chosen to miss visits.

22. Mother and Father have each suffered relapses in their recovery from alcohol addiction. Services were provided by DCS to assist the parents; services they failed to complete.

23. Mother tested positive for alcohol once and Father refused to submit to a test at one point.

24. Neither parent completed individual therapy.

25. Both parents failed to follow-up on psychiatric appointments.

26. Neither parent has found suitable independent housing. Father resides with his mother, who he has described as an alcoholic who drinks daily. Mother lives with her grandmother currently.

27. Mother has participated in the Young Mother's Program to find housing. Her level of commitment is proven by her failure to attend that program's meetings in the month of August.

28. Mother remains unemployed. She worked for a short time but the job proved to "not be a good fit."

29. Father, to his credit, is working and attending Ivy Tech. He has, however, failed to complete the services mandated in the January order.

(Appellant's App. pp. 7-8). These findings are more than sufficient to support the trial

court's conclusion that the conditions that led to E.M.R.'s removal and continued

placement outside of the home would not be remedied. Thus, we conclude that the trial court's error of including a faulty finding of fact number five was harmless.

Further, although the trial court erroneously cited E.M.R.'s alleged skull fracture in its conclusions regarding E.M.R.'s best interests, the findings with respect to E.M.R.'s best interests are also more than sufficient to support the trial court's termination of Mother and Father's parental rights. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS to the totality of the evidence. *In re T.F.,* 743 N.E.2d 766, 776 (Ind. Ct. App. 2001). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* In analyzing a child's best interests, we recognize that permanency is a central consideration. *In re G.Y.,* 904 N.E.2d 1257, 1265 (Ind. 2009). The trial court need not wait until a child is irreversibly influenced such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re T.F.,* 743 N.E.2d at 776.

Here, the trial court granted Mother and Father one eight month extension of time to finish the services provided by DCS. As a condition of this extension, the trial court ordered Mother and Father to be 100% compliant with the services. Although they did complete many of the services, Mother and Father missed follow-up psychiatric appointments, failed to show up for individual therapy appointments, and cancelled multiple visits with E.M.R. Both parents had relapses, and Father engaged in criminal activity. These actions demonstrated that, as the trial court concluded, Mother and Father

16

were not committed to sobriety and to acting as proper parents for E.M.R. Thus, we find that there was sufficient evidence supporting the trial court's conclusion that termination was in E.M.R.'s best interests, and the trial court's erroneous reference to E.M.R.'s alleged skull fracture was therefore harmless.

## II. *Permanency Plan*

Next, Mother and Father allege that the DCS did not present a satisfactory plan regarding E.M.R.'s future care and treatment. DCS established during the evidentiary hearings that E.M.R.'s foster mother wished to adopt him. Mother and Father now claim that this placement is questionable because E.M.R.'s foster mother has seven children living with her, including E.M.R., and DCS did not establish whether the square footage of the foster mother's house is sufficient to properly house all seven children.

In order for the trial court to terminate a parent-child relationship, the trial court must find that there is a satisfactory plan for the care and treatment of the child. *In re S.L.H.S.,* 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). This plan does not need to be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* We have found that a general plan of adoption is acceptable even if DCS has not yet identified a specific adoptive family. *See In re D.D.,* 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*.

As DCS' plan was not required to be "detailed," we conclude that DCS was not required to provide Mother and Father with the exact square footage of Mother's home. *See S.L.H.S.,* 885 N.E.2d at 618. Instead, a general sense of the plan for E.M.R. was

17

sufficient. The trial court satisfied this requirement when it concluded that "E.M.R. remains in his original foster placement. He has thrived there. His foster mother wishes to adopt [him]. She offers this child stability, consistency, and love." (Appellant's App. p. 9). As the parents have not otherwise disputed the foster mother's ability to parent E.M.R., we conclude that the trial court did not err in determining that her adoption of E.M.R. was a suitable plan for his care and treatment.

### III. *Mother's Petition for an Updated Interview*

Mother separately raises the issue of whether the trial court abused its discretion when it denied her petition for an updated interview. Dr. Wax conducted an assessment of Mother on May 7, 2009, whereby he formulated opinions regarding her sobriety and her ability to parent E.M.R. On November 4, 2010, approximately six months after DCS filed its petition to terminate Mother's parental rights, Mother filed a petition for an updated interview with Dr. Wax. In her petition, she claimed that Dr. Wax's assessment was outdated as she had become sober and more mature since she had met with him. On December 9, 2010, after a hearing, the trial court denied Mother's petition. Mother now argues that the trial court denied her due process as it prevented her from presenting evidence of her improved situation by way of expert analysis.

The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *Thompson v. Clark Cnty. Div. of Family and Children,* 791 N.E.2d 792, 794-95 (Ind. Ct. App. 2003), *trans. denied.* This court has held that "[t]he fundamental requirement of due process is

18

the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 795. The nature of process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." *Id.*

Preliminarily, we note that Mother has not satisfied her burden on appeal by providing us with the transcript of the December 9, 2010 hearing. Without this transcript, we cannot determine whether the trial court abused its discretion and violated her due process rights. Nevertheless, we conclude that even if the trial court did abuse its discretion when it denied Mother's petition for an updated interview, the error was harmless as Dr. Wax's testimony was not the sole basis for the termination of her parental rights. First, even though the trial court allowed Dr. Wax to testify without updating his assessment of Mother, Mother had the opportunity to cross-examine him at the hearing. We have previously commented that cross-examination is "fundamental and essential to a fair trial," and thus essential for due process. *Id.* As a result of this cross-examination, Mother was able to ask Dr. Wax questions regarding how some of her conditions, if remedied, would have alleviated Dr. Wax's concerns or changed his recommendations. Mother then called her counselor at Community Corrections, Peggy Karamalegos

(Karamalegos) as a rebuttal witness to Dr. Wax. Karamalegos testified that Mother had opened up more over the previous year and was determined to overcome her alcohol addiction and to become a good parent. Through both her cross-examination of Dr. Wax and her rebuttal examination of Karamalegos, Mother was able to emphasize that Dr. Wax's assessment was outdated and that she had improved since the last time he had seen her.

Most significantly, though, the trial court did not terminate Mother's parental rights as a result of Dr. Wax's testimony. Instead, the trial court allowed Mother an additional eight months to comply with its order. Thus, Mother did not suffer any harm from the alleged due process violation. In light of these facts, we conclude that even if the trial court did abuse its discretion, Mother was not denied due process as the error was harmless.

## IV. *Breathalyzer Device*

Finally, Father separately raises the issue of whether the trial court abused its discretion when it admitted evidence of his breathalyzer test results without verifying that the breathalyzer device was properly calibrated. At trial, the program specialist for the BIP, James Sapp (Sapp), testified that Father "blew a .101" on the breathalyzer during his individual therapy appointment with Sapp on October 29, 2009. (Vol. I Tr. p. 23). During cross-examination, Father asked Sapp what model of breathalyzer he had used and whether it had been calibrated that week. Sapp responded to both questions that he did not know. Because Sapp could not verify that the breathalyzer had been properly

calibrated, Father now argues that the result of his breathalyzer test was inadmissible at trial.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re S.W.,* 920 N.E.2d 783, 788 (Ind. Ct. App. 2010). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* If a trial court abuses its discretion by admitting the challenged evidence, we will only reverse if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Id.* (quoting *Payne v. State,* 854 N.E.2d 7, 13 (Ind. Ct. App. 2006)).

Generally, a party must object to evidence at the time it is offered into the record. *Perez v. Bakel,* 862 N.E.2d 289, 295 (Ind. Ct. App. 2007). A party that fails to timely object waives the right to have the evidence excluded at trial and the right to assert on appeal that the admission of the evidence was erroneous. *Id.* As Father failed to object to the admission of Sapp's testimony regarding the result of the breathalyzer test, we conclude that he has waived his claim regarding its admissibility.

Nevertheless, Father now attempts to avoid waiver by arguing that the admission of the breathalyzer test result was a fundamental error. The fundamental error exception is an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of the issue on appeal. *S.D. v. State,* 937 N.E.2d 425, 429 (Ind. Ct. App. 2010), *trans. denied.* The exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or

potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Id.* It is available only in egregious circumstances. *Id.*

We conclude that the harm that resulted from the admission of Father's breathalyzer test results was insubstantial. The breathalyzer test occurred on October 29, 2009—almost two years prior to the trial court's termination of Father's parental rights. Father had subsequent issues with alcohol, as he admitted in his testimony, and as was evident in his subsequent conviction for driving under the influence and his subsequent July 3, 2011 arrest for public intoxication. The trial court did not even cite the breathalyzer test in its findings of fact or conclusions of law. The most relevant of the trial court's findings was number twenty-two, which stated that "Mother and Father have each suffered relapses in their recovery from alcohol addiction. Services were provided by DCS to assist the parents; services they failed to complete." (Appellant's App. p. 8). As we stated above, absent evidence of Father's breathalyzer test, there was still evidence to support the trial court's conclusion that Father had suffered relapses. In addition, it is apparent in the trial court's finding that it considered the evidence that Father had failed to utilize the services DCS had provided to help him recover from his addiction as equally significant as Father's relapses. In light of these circumstances, we cannot conclude that the trial court committed a fundamental error in allowing Sapp to testify about the result of Father's breathalyzer test. Thus, the trial court did not abuse its discretion.

## CONCLUSION

22

Based on the foregoing, we conclude that (1) the trial court's findings of fact supported its termination of Mother and Father's parental rights to E.M.R.; (2) the trial court did not err in finding that DCS had provided a satisfactory plan for E.M.R.'s care and treatment; (3) the trial court did not abuse its discretion when it denied Mother's petition for an updated interview; and (4) the trial court did not abuse its discretion when it allowed DCS to submit evidence from a breathalyzer test without confirming that the breathalyzer had been calibrated within the week that the test was performed.

Affirmed.

NAJAM, J. and DARDEN, J. concur