Michael LAWSON, Appellant,

v.

MARION COUNTY OFFICE OF FAM-
ILY AND CHILDREN and Child
Advocates, Inc., Appellees.

No. 49A02–0504–JV–294.

Court of Appeals of Indiana.

Oct. 14, 2005.

Patricia Caress Mcmath, Indianapolis,
IN, Attorney for Appellant.

Barry A. Chambers, Jennifer Balhon,
Child Advocates, Inc., Indianapolis, IN,
Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Michael Lawson ("Father") appeals from
the trial court's termination of his parental
rights with respect to his daughter K.L.
He presents a single dispositive issue for

our review, namely, whether he was denied his right to due process.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Father was married to Clareena Lawson ("Mother"), and they had two children together, K.L. and J.L.[1] Mother also has other children with different fathers. In July 2003, Dee Eyers, an investigator with the Marion County Office of Family and Children ("OFC"), went to Mother's home[2] to follow up on a referral from Youth Emergency Services ("YES"), which had removed three of Mother's children. When Eyers arrived, she observed that the house was very dirty, including dried human feces on the carpet in an upstairs bedroom, a "filthy" toilet and sink in a bathroom, dirty dishes piled up in the kitchen sink, and "long standing dirt" throughout the house. Transcript at 33–34. In addition, Eyers observed an old dishwasher and dead birds lying in the front yard.

Father and Mother brought K.L., who was three years old at the time, and her sister D.S. to YES at approximately 10:00 p.m. that evening, and Eyers observed that both girls were "very dirty" and had head lice. *Id.* at 37. The girls were also very hungry and reported that they had not eaten all day. Caseworkers at YES cleaned the girls up and ultimately placed them in foster care. YES had earlier removed J.L., who was four months old at the time, and discovered that he had a severe diaper rash. J.L. had to undergo inpatient medical treatment to treat the rash, which was extensive and had caused open and bleeding sores. J.L. ultimately died of sepsis as a result of the diaper rash.

K.L. was found to be a Child in Need of Services ("CHINS"), and the trial court entered a dispositional order making K.L. a ward of the OFC. The OFC placed K.L. in foster care and referred Father for services, including a parenting assessment, a drug and alcohol assessment, parenting classes, and drug screens. Father completed both initial assessments, but he did not consistently undergo drug screens and he did not complete the recommended drug treatment program or parenting classes. In addition, Father did not maintain contact with his case manager at the OFC. But Father did have relatively consistent visitation with K.L.

K.L. has thrived since being placed with her foster mother, Laura Good. K.L. was exhibiting significant behavioral problems at the time she was declared a CHINS, but those began to improve through therapy and with Good's supervision. K.L. has bonded well with her foster family, and she gets to visit with her biological siblings from time to time.

In July 2005, the OFC filed a petition to terminate Mother's and Father's parental rights with regard to K.L., as well as Mother's parental rights over each of her other children and the rights of the fathers of those children. Father did not appear at the final hearing, despite having been notified of the date, but his attorney was present. At the beginning of the hearing, the OFC's attorney stated, "Your Honor, it's my plan to present brief testimony from the Case Manager with regard to [Father] and then I believe [Father's attorney] can be excused, and I'll present the remainder of the evidence [with regard

---

1. Lawson is J.L.'s legal father, but might not be his biological father.

2. Father was living elsewhere at the time, and the couple eventually divorced.

to the other parents] after that." *Id.* at 20.

After the first two witnesses, Eyers and Shane Dietz, case manager with the OFC, testified, Father's attorney stated: "Your Honor, if none of [the OFC's] further evidence relates to my client, may I be excused?" *Id.* at 45. The OFC's attorney made no comment, and the trial court advised Father's attorney that he was excused. Despite the unmistakable implication that the OFC had concluded with its evidence against Father, the OFC then presented additional evidence against him, including a sixteen-page report entitled "Evaluation and Recommendations for the Parent Assessment with Expanded Substance Assessment and Urine Screen Completed on Michael Lawson." Exhibits at 29. At the conclusion of the hearing, the trial court entered its order terminating Mother's and Father's parental rights and made the following relevant findings and conclusions:

[ ] The Children have been removed from their parents['] care and custody pursuant to a disposition order for more than six (6) months.

\* \* \*

... Ms. Lawson agreed Mr. Lawson was "mean to her and her children."

\* \* \*

[ ] Mr. Lawson has not completed any services ordered by the Juvenile court with the exception of the original parenting and drug/alcohol assessment. In his parenting assessment he admitted to using marijuana the night before and tested positive for cocaine. He did not complete any of the services recommended in his parenting assessment.

[ ] In Mr. Lawson's ... parenting evaluation[ ], the prognos[is] for reunification was poor.

\* \* \*

[ ] There is a reasonable probability that the conditions which resulted in the removal of the Children and the reasons for their continued placement outside [Mother's] ... and [Father's] care will not be remedied, and that continuation of the parent-child relationship poses a threat to the Children's well being.

[ ] The [OFC] plan for permanency for the Children is adoption.

\* \* \*

[ ] Because of the Children's need for permanency and for stable loving homes free from further neglect and abuse and [Mother's] pattern of behavior, choices, failures to protect her Children and her lack of demonstrated ability to provide for those needs, it is in the children's best interest to terminate the parent-child relationship. In addition, ... [Father] has [not] demonstrated the ability to provide for the needs of [K.L.].

Appellant's App. at 10–14. Father now appeals.[3]

## DISCUSSION AND DECISION

Father contends that he was deprived of his right to due process when the trial court admitted evidence against him after his attorney was excused from the hearing. The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *Thompson v. Clark County Div. of Family & Children*, 791 N.E.2d 792, 795 (Ind.Ct. App.2003), *trans. denied.* When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process.

---

3. Mother is not a party to this appeal.

*Id.* "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

■ The nature of process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *In re C.C.,* 788 N.E.2d 847, 852 (Ind.Ct. App.2003). The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." *Thompson,* 791 N.E.2d at 795 (quoting *Mathews,* 424 U.S. at 334, 96 S.Ct. 893).

Here, both the private interests and the countervailing governmental interests that are affected by the proceeding are substantial. In particular, the action concerns a parent's interest in the care, custody, and control of his children, which has been recognized as one of the most valued relationships in our culture. *See id.* Moreover, it is well settled that the right to raise one's children is an essential, basic right that is more precious than property rights. *Id.* As such, a parent's interest in the accuracy and justice of the decision is commanding. *Id.* A parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship. Ind.Code § 31–32–2–5. On the other hand, the State's parens patriae interest in protecting the welfare of the children involved is also significant. *Id.* Delays in the adjudication of a case impose significant costs upon the functions of the government as well as an intangible cost to the lives of the children involved. *Id.*

■ When balancing the competing interests of a parent and the State, we must also consider the risk of error created by the challenged procedure. *Id.* The risk of error created by entering judgment after conducting a hearing where evidence against a parent is presented without his attorney present is substantial. Obviously, here, Father was unable to cross-examine some of the witnesses against him and was unable to object to key exhibits admitted into evidence after his attorney was excused. As such, the trial court may not have had an accurate picture of the evidence before making its decision. *See id.* Indiana Code Section 31–32–2–3(b) provides that a parent in a proceeding to terminate the parent-child relationship is entitled to cross-examine witnesses and introduce evidence on his behalf. In addition, cross-examination is "fundamental and essential to a fair trial." *Id.* (quoting *Parker v. State,* 773 N.E.2d 867, 869 (Ind. Ct.App.2002)).

Here, at the beginning of the final hearing, the OFC's attorney stated that he would present "brief testimony from the Case Manager" with regard to Father, after which Father's attorney could be "excused." Transcript at 20. The OFC first called Dietz, the OFC case manager, to the stand, and he testified that Father complied with the initial parenting and drug and alcohol assessments but did not complete the drug treatment program or parenting classes. Dietz also testified that he had lost contact with Father approximately three months prior to the final hearing. Finally, Dietz testified that K.L. was to be adopted. Next, Eyers, the OFC investigator, testified regarding Mother's home and K.L.'s status at the time of her initial investigation. Eyers also testified regarding the circumstances surrounding J.L.'s

death. Eyers stated that she did not have any personal knowledge regarding whether Father had completed any services that were referred for him.

After those two witnesses, and after the OFC introduced into evidence nine exhibits pertaining to Father, Father's attorney asked to be excused "if none of [the OFC's] further evidence" related to Father. *Id.* at 45. The OFC made no indication that it would offer additional evidence against Father, and the trial court excused Father's attorney from the hearing. Thereafter, Dawn Bergen testified regarding the parenting assessment of Father that she had conducted, and the trial court admitted her sixteen-page report into evidence. Bergen testified that Father had a drug problem, was unemployed, had no housing, had poor parenting skills, and was mildly mentally handicapped. She stated that Father admitted that he could not care for K.L. without help. Father also admitted that he smoked marijuana, and he tested positive for cocaine on the day of his assessment. Bergen stated that in her opinion, the prognosis for Father's reunification with K.L. was poor. Then Mother testified that Father was abusive to her and to her children and that he had lost various jobs because of his marijuana smoking. Finally, K.L.'s foster mother testified that K.L. had been thriving while in her care.

A significant portion of the evidence against Father, in particular, the parenting assessment, was presented after the trial court had excused his attorney from the hearing on the basis that the OFC had concluded its evidence against Father. While the evidence presented prior to his departure showed that Father had not fully complied with his case plan, the only direct evidence showing that Father should not be reunified with K.L. came from Bergen's testimony and her assess-

ment. While the evidence presented before Father's attorney left the hearing might have supported reasonable inferences sufficient to terminate Father's parental rights, we cannot say that the remainder of the evidence was insignificant to the trial court's decision. In particular, two of the trial court's findings are based upon Bergen's testimony and assessment: (1) that he admitted to using marijuana the night before the parenting assessment and tested positive for cocaine; and (2) that the prognosis for his reunification with K.L. was poor. Thus, we reject the State's contention that any error was harmless.

Under these circumstances, we conclude that Father's due process rights were significantly compromised in that he was unable to cross-examine Bergen and Mother regarding critical evidence against him. While the State obviously has a substantial interest in protecting K.L.'s welfare, and while a swift resolution of this matter is necessary to avoid further uncertainty regarding K.L.'s permanency, we hold that the error in this case is too great to ignore. We therefore reverse the entry of judgment terminating Father's parental rights and remand this case to the trial court with instructions to hold a proper final termination hearing.

Reversed and remanded.

BARNES, J., and CRONE, J., concur.