**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 18 2013, 9:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH A. JOHNSON**
**LILABERDIA BATTIES**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**ROBERT J. HENKE**
Office of the Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Office of the Attorney General
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF THE )
PARENT-CHILD RELATIONSHIP OF L.N.C. AND L.G.C.: )
)
J.T., )
)
     Appellant-Respondent, )
)
          vs. )    No. 49A02-1305-JT-415
)
INDIANA DEPARTMENT OF CHILD SERVICES, )
)
     Appellee-Petitioner. )

**December 18, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

J.T. ("Father") appeals the trial court's termination of his parental rights over his minor children L.N.C. and L.G.C. ("the children"). Father raises two issues for our review:

1. Whether Father was denied his right to due process when the trial court denied his request for a continuance and "vouched" for the public defender.

2. Whether the trial court's conclusions that continuation of the parent-child relationships poses a threat to the children and that termination is in the children's best interests are clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

J.C. ("Mother")[1], who was not married to Father, gave birth to the children on June 8, 2011. Father was incarcerated at the time, and he has been incarcerated since their birth. On June 29, the Indiana Department of Child Services ("DCS") filed petitions

---

[1] Mother has executed consents for the children to be adopted and does not, therefore, participate in this appeal.

alleging that the children were children in need of services ("CHINS") "based on their mother's substance abuse, untreated mental health and instability."[2] Appellant's App. at 26. The trial court ultimately ordered that the children be placed in relative care. Because Father had not established paternity of the children, the trial court ordered him to submit to DNA testing.[3] The trial court did not order services for Father because of his incarceration. Father's expected "out date" is in September 2015, after which he will be placed on home detention. Id.

On October 10, 2012, DCS filed petitions to terminate Father's and Mother's parental rights to the children. And the trial court held an evidentiary hearing on April 3, 2013, with Father's counsel present and with Father participating by telephone from prison. Following the evidentiary hearing, on April 12, the trial court entered its order and judgment terminating Father's parental rights. The trial court found and concluded in relevant part as follows:

8. [Father] has many convictions during the past ten years which include cocaine, methamphetamine, battery and theft.
9. [Father] has completed a parenting class, a collision repair class, and resides in a therapeutic community in prison, receiving counseling and drug classes. He also participates in Alcoholics and Narcotics Anonymous meetings.
10. [Father] has never seen the children in person, and [he] has not requested visitation from the family case manager or Guardian ad Litem.
11. He sent one letter to the family case manager.
12. The children have remained in the relative placement since their removal on August 18, 2011, over nineteen (19) months ago.

---

[2] Father has not included copies of the CHINS petitions in his appendix on appeal, but the trial court's order terminating Father's parental rights summarizes the reasons for the children's removal from Mother's care.

[3] The trial court established Father's paternity of the children by order dated November 29, 2012.

3

13.     There are two older half siblings residing in the same placement. This placement is preadoptive, and [it] is basically the only home the twins have known.

14.     [The children] have been observed as being strongly bonded with their half siblings as well as with their caregivers.

15.     The sibling group bond is important because it is the only consistency [the children] have known.

16.     There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their father. [Father] remains incarcerated and his release is not imminent. He has participated in programs offered at prison, which is nothing but commendable. However, given his lack of contact with [DCS] and lack of interest in his CHINS case, it is probable that this lack of interest would continue after his release.

17.     Continuation of the parent-child relationship poses a threat to the children's well-being. [Father] is a stranger to the children and cannot offer them permanency. To continue the relationship would pose a barrier to reaching the needed and deserved goal of permanency through adoption along with their half siblings. The longer time passes, the more bonded and comfortable the children will become. To then sever the sibling group would only cause anguish to the children and not be in their best interests.

18.     Termination of the parent-child relationship is in the best interests of the children. Termination would not only allow the children to be adopted into a safe, stable and permanent home where their needs will be met, it would also allow them permanency with their half siblings in the only home they have known and by the only caregivers they have known.

19.     There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

20.     Timothy Nordstrom, the family case manager, believes it to be very important that the children remain in the sibling group. He also believes that it would not be in the best interests to wait for [Father] to be released because of the lack of bond and that classes and programs taken in prison does not change the children's need for permanency at this time.

21.     The children's Guardian ad Litem recommends adoption as the permanency plan given the length of time the CHINS case has been pending, permanency, the bonded placement, and [the] family relationship.

Id. at 26-27. This appeal ensued.

4

## DISCUSSION AND DECISION

### Issue One:  Due Process

Father first contends that the trial court violated his right to due process when it denied his request for a continuance of the termination hearing.  In particular, during the termination hearing, Father stated that he was unhappy with his public defender, and he requested time to obtain a new lawyer.  Father also contends that the trial court improperly "vouched" for his public defender.  Appellant's Brief at 8.  We address each contention in turn.

The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding.  Lawson v. Marion County Ofc. of Family & Children, 835 N.E.2d 577, 579 (Ind. Ct. App. 2005).  When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process.  Id.  The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.  Id. at 580.

The nature of process due in a termination of parental rights proceeding turns on the balancing of three factors:  (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure.  Id.  The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless flexible and calls for such procedural protections as the particular situation demands.  Id.

5

Here, because DCS requested a hearing on its termination petition, the trial court had 180 days from the date of the petition to complete the hearing. See Ind. Code § 31-35-2-6. DCS filed its petition on October 10, 2012, so the 180 day-deadline was April 8, 2013. During the evidentiary hearing on April 3, after Father testified and in the middle of the family case manager's testimony, Father, for the first time, expressed to the trial court his dissatisfaction with his public defender. The following colloquy occurred:

| | |
|---|---|
| Father: | I do not feel like I am being sufficiently represented by the counsel that was appointed to me and represented me in this case. |
| Court: | Why not? |
| Father: | I would like to get Mr. Scott Kainrath off of my case and if I can't be appointed another attorney I would like to go ahead and hire my own counsel. |
| Court: | Well it's time for the trial at this point. How would you hire your own attorney? |
| Father: | Well I don't know this. I am going to pool all of my resources. I don't really, I can't really afford another attorney at this point. |
| Court: | The public defenders will not appoint you a new public defender. What is it . . . why . . . I don't understand . . . . |
| Father: | Well I mean, I have written several letters in the past to the courtroom number twelve asking that my attorney be fired from this case anyways and I have detained wrote [sic] at least three one-page letters to the Judge of courtroom twelve . . . . |
| Court: | Well that's me but I didn't get anything. |

*  *  *

| | |
|---|---|
| Court: | See we have time limitations and the time limitation runs in five days. You can fire Mr. Kainrath but you would have to represent yourself at this point, you can't afford a private attorney and they will not appoint another public defender. Mr. Kainrath has an excellent reputation out here. |
| Father: | Well you know, I have tried to get Mr. Kainrath to get a hold of my mother and my brother over a year ago and he failed to do that for me. |
| Court: | This case started in October. |
| Father: | Well, and I have asked for several visits from Mr. Kainrath and I did not get any of those. And I have written several |

6

letters and I have had my people call his office and I have not gotten any returns on the phone calls [and] no returns on the letters. He hasn't been communicating with me and I don't feel like that I have been sufficiently represented by my counsel.

Court:      Well, like I said . . .

Father:     I'd like time to hire . . .

Court:      . . . in the middle of the trial and if you go without an attorney you are going to be held to the same standards of an attorney and you understand what the . . .

Father:     I don't want to go without an attorney, I'd like to hire another attorney. I'd like time to hire another attorney.

Court:      But you don't have any money, you said, to hire an attorney and I can't give you that time. I mean this thing's not going to wait until 2015 and by statute we have to have this matter heard within six months of it being filed and that is April 8th and this is the 3rd.

Father:     Well, so you are denying me new counsel.

Court:      I can't appoint you new counsel. I can . . . first of all, we have five days, second of all, my experience is if you fire your public defender they refuse to appoint a new public defender to represent you.

Father:     Well I don't see why, how that's fair when . . .

Court:      I have no control over that.

Father:     Well . . .

Court:      I think, I mean everybody in this courtroom knows Mr. Kainrath and they know his reputation. I'm sorry you didn't get along with him . . . are you comfortable with me saying that . . .

Transcript at 54-56. The attorney representing Child Advocates, Inc. then objected to Father's request for a continuance. The Child Advocates attorney also pointed out that: Father's mother was present in the courtroom at that time, contradicting Father's assertion that his public defender had not contacted her; Mr. Kainrath had been representing Father since August 2011 and had participated in at least one telephonic hearing during which Father did not express any dissatisfaction with his representation;

7

and no one had received any letters from Father expressing dissatisfaction with Mr. Kainrath.

On appeal, Father does not explain the basis for his alleged dissatisfaction with his public defender. Father does not describe how the outcome of the proceeding might have been different had he been granted time to find a new attorney. Indeed, as the trial court found, Father did not have any confidence that he could afford to hire an attorney, and there is no evidence to contradict the trial court's statement that another public defender would not be appointed. The evidence shows that Father had an opportunity during the telephonic hearing in January 2013 to express dissatisfaction with his public defender at that time, but did not do so. Given the fact that the deadline to complete the hearing was in five days' time, we cannot say that the trial court deprived Father of his right to due process when it denied his request for a continuance in the middle of the April 3 hearing.

Finally, Father's assertion that the trial court's "vouching" of the public defender denied Father of his right to a "fair, impartial, and detached magistrate" is simply unfounded. Appellant's Brief at 8. The trial court merely assured Father that his attorney had a good reputation. The trial court's statements did not indicate any bias against Father. Father has not demonstrated that his right to due process was violated.

**Issue Two: Sufficiency of the Evidence**

We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Bailey v. Tippecanoe Div. of Family & Children (In re M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a

8

trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[4] That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and

---

[4] Indiana Code Section 31-35-2-4(b)(2)(B) also allows DCS to allege that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services." But that additional, alternative provision is not relevant here.

9

convincing evidence.'" <u>R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)</u>, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. <u>Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)</u>, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), <u>trans. denied</u>. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. <u>Id.</u> Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. <u>Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)</u>, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). <u>trans. denied</u>.

Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. <u>Bester v. Lake Cnty. Ofc. of Family & Children</u>, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. <u>Id.</u> "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." <u>Quillen v. Quillen</u>, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. <u>In re L.S.</u>, 717 N.E.2d at 208.

Father does not challenge the trial court's findings of fact in its order terminating his parental rights. Rather, Father challenges only the court's legal conclusions that, on these facts, termination of his parental rights is justified because a continuation of the

parent-child relationships poses a threat to the children's well-being and it is in the children's best interests.[5] But Father's arguments in support of these contentions are not cogent. Indeed, our reading of the argument section of Father's brief reveals no contentions specific to the well-being element of the statute. Nonetheless, we will endeavor to address Father's contentions.

### Children's Well-Being

Father asserts that the children should be permitted to live with one of his relatives pending his release from prison. But the evidence shows that Father's proffered relative placements were not appropriate. Instead, DCS placed the children with half-siblings in a caring home. That home is the only one the children have known since their birth in 2011. Still, Father maintains that he will be able to care for the children upon his release, and he testified that his earliest out date is September 2015.[6]

But a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.), 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id.

---

[5] Father's brief focuses almost exclusively on the issue of whether the DCS proved that Father will not remedy the conditions that resulted in the children's removal, but we need not consider that argument given the disjunctive nature of Indiana Code Section 31-35-2-4(b)(2)(B) and our holding that the trial court's conclusion is justified under subsection (b)(2)(B)(ii).

[6] In his brief, Father makes reference to an outdate of September 2014 for credit time, but he does not cite anything in the record to support that date. Father's testimony clearly indicates that his earliest possible release is September 2015.

The evidence shows that the children were removed from Mother's care only a few weeks after their birth. Again, Father has been incarcerated during their entire lives, and he has never requested visitation with the children. There is, then, simply no bond between Father and children. And while Father took a parenting class in prison, he has been unable to participate in any services that might have been offered by DCS had he not been incarcerated.[7] During the CHINS proceedings, Father did not maintain contact with the family case manager. Obviously, Father has not maintained suitable housing or a legal source of income during his incarceration.

The evidence supports the trial court's conclusion that the continuation of the parent-child relationships would pose a threat to the children's well-being. The family case manager, Timothy Nordstrom, testified that the children "don't have a relationship or bond" with Father because they have never met him. Transcript at 61. And Nordstrom testified that the children live with the only family "they have ever known" and they need permanency. Id. And the Guardian ad Litem testified that waiting two or three years for Father to get out of prison and begin the process of reunification would "interfere with their structure" and "would cause change in their li[ves] which could be upsetting to young children." Id. at 79. Finally, the children's foster mother testified that "it would be detrimental to [the children] to be separated" from their half-siblings. Id. at 72.

---

[7] Father mentions that DCS did not offer him services, but it is well settled that DCS is not required to provide a parent with services directed at reunification while the parent is incarcerated. See Rowlett v. Vanderburgh County Ofc. of Family & Children, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), trans. denied.

12

Father's contentions on this issue amount to a request that we reweigh the evidence, which we will not do. Again, Father does not challenge any of the trial court's findings on appeal. The evidence shows that Father has a criminal history that includes "many convictions during the past ten years" including offenses involving cocaine and methamphetamines, battery, and theft. Appellant's App. at 26. It is because of Father's incarceration and failure to request visitation that Father has not even met the children.

Given Father's criminal history, failure to establish any bond with the children, and continued incarceration, Father cannot show that he will be able to provide adequate care or permanency for the children in the future. Father has not demonstrated that the trial court's conclusion that continuation of the parent-child relationships poses a threat to the children's well-being is clearly erroneous. Accordingly, we agree with the trial court that the termination of Father's parental rights over the children was appropriate under Indiana Code Section 35-35-2-4(b)(2)(B)(ii).

**Best Interests**

Father also contends that termination is not in the children's best interests. In support of that contention, Father cites to this court's opinion in Rowlett v. Vanderburgh County Off. of Family & Children, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), trans. denied. But in that case, the father was involved in the children's lives prior to his incarceration and maintained contact with the children during his incarceration. Indeed, as this court noted, "Father sent [his children] letters, and they sent him pictures which they had drawn. Father also communicated with the children through telephone calls. When he would call, the children were happy to talk to him, telling him that they loved

13

him and asking when he was coming home." Id. Given the stark disparity between the relationships in Rowlett and those in this case, Father has not shown that the holding in Rowlett, where we reversed the termination of father's parental rights, has any precedential value here.

Family Case Manager Nordstrom testified that the children have "bonded a great deal" with their half-siblings and with their foster parents, who plan to adopt the children. Transcript at 52. Nordstrom testified further that the children "need" and "deserve" permanency now. Id. at 62. And the Guardian ad Litem testified that termination and adoption were in the children's best interests. Again, Father's contention on this issue amounts to a request that we reweigh the evidence, which we will not do.

Affirmed.

BAKER, J., and CRONE, J., concur.